Mrs. W. A. Shadow et al., Respondents-Complainants,

*v.*

Volunteer Electric Cooperative, Petitioner-Defendant.

448 S.W.2d 416.

(*Knoxville*, September Term, 1969.)

Opinion filed December 15, 1969.

Herman M. Gregory, Ziegler & Henley, Athens, for respondents-complainants.

KELLY & CAMERON, South Pittsburg, for petitioner-defendant.

ALFRED T. MacFARLAND, Lebanon, ROBERT H. MARQUIS, General Counsel, LYNN SEEBER, Solicitor, C. A. REIDINGER, Assistant General Counsel, JUSTIN M. SCHWAMM, Tennessee Valley Authority, Knoxville, amici curiae.

CRESON, JUSTICE, dissented in part.

MR. JUSTICE DYER delivered the opinion of the Court.

This cause comes to this Court by the grant of the writ of certiorari directed to the Eastern Section of the Court of Appeals. In this opinion Volunteer Electric Cooperative, defendant in the trial court and petitioner here for certiorari, will be referred to as the Cooperative, and Mrs. W. A. Shadow, et al., complainants in the trial court and respondents here, will be referred to as complainants.

The Cooperative is a non-profit membership corporation incorporated pursuant to Chapter 176, Public Acts of 1939, said statute being designated the "Electric Cooperative Law" and now carried as Chapter 25, Title 65 of T.C.A. A corporation organized under this statute has as its purpose the supplying of electric energy to its members and encouraging the greater use thereof by the maintenance of the lowest feasible rates.

Complainants filed their original bill as a class action for the benefit of (a) present members of the Cooperative, (b) deceased members, and (c) former members no longer receiving electrical services. In this bill they sought distribution of accumulated revenues alleged to be excessive under T.C.A. sec. 65-2516, which statute is as follows:

Revenues of a cooperative for any fiscal year, in excess of the amount thereof necessary:

(A) To defray expenses of the cooperative and of the operation and maintenance of its facilities during such fiscal year;

(B) To pay interest and principal obligations of the cooperative coming due in such fiscal year;

(C) To finance, or to provide a reserve for the financing of, the construction or acquisition by the cooperative of additional facilities to the extent determined by the board of trustees;

(D) To provide a reasonable reserve for working capital;

(E) To provide a reserve for the payment of indebtedness of the cooperative maturing more than one (1) year after the date of the incurrence of such indebted-

ness in an amount not less than the total of the interest and principal payments in respect thereof required to be made during the next following fiscal year; and

(F) To provide a fund for education in cooperation and for the dissemination of information concerning the effective use of electric energy and other services made available by the cooperative, shall be distributed by the cooperative to its members as, and in the manner, provided in the by-laws, either (1) as patronage refunds prorated in accordance with the patronage of the cooperative by the respective members paid for during such fiscal year, or (2) by way of general rate reductions, or (3) by combination of such methods. Nothing herein contained shall be construed to prohibit the payment by a cooperative of all or any part of its indebtedness prior to the date when the same shall become due.

Under this statute annual revenues of the Cooperative are first distributed in accord with paragraphs (A) through (E) and then any remaining, undistributed revenue would be designated excessive revenue and distributed in accord with paragraph (F). This paragraph provides that after funds are set aside for educational purposes that the remaining revenue is to be distributed in one of three ways or combination thereof; that is, first, by rate reduction; second, patronage refund; or third, to retire debt prior to maturity. The principal issues in this case are: first, whether the Cooperative has accumulated excessive revenues; and, second, if so, how should same be distributed?

As the chancellor noted, the trial of this cause took some two and one-half years in which time a great deal

of the proof was taken. A substantial part of this proof was on the issue of whether the Cooperative had, in fact, accumulated revenues over the years which, under the statute, would be excessive revenues. A decision on this point is very difficult since men knowledgeable in this particular field will differ as to just how much of the annual revenue should be held in reserve for working capital, additional facilities, and long-term debt. We think the chancellor reached an excellent and equitable solution in this difficult problem.

The Rural Electric Administration (REA), an arm of the United States Government, has made some eighteen loans to this Cooperative, the total amount being Nine Million Eight Hundred Three Thousand Dollars. As noted by the Court of Appeals, the REA has been the guiding light and right arm of electric cooperatives and over the years has gained a great deal experience financing electric cooperatives in many states. There was entered in evidence a bulletin issued by REA bearing date of February 1, 1962, and designated "Bulletin 1-7" (Electric) which sets out a formula as a guide in establishing reserve funds for electric cooperatives. In this bulletin it is said:

> * * * sufficient working capital to meet promptly its operating costs, quarterly debt service requirements, routine plant replacements and interim financing of current construction. Generally, the funds needed for those purposes should not exceed 6 per cent of total plant.

> The amount needed for these replacements should reflect such factors as the age and condition of plant and policies on replacements. Reserve funds needed for

such replacements generally should not exceed 6 per cent of total plant.

In considering the amount of reserve funds needed for contingencies, consideration should be given to possible storm damage and other "acts of God" not covered by insurance and to possible loss of revenue from large and uncertain loads. Generally, the reserve funds needed for contingencies should not exceed 3 per cent of total plant.

Advance Payments: It is recommended each borrower establish a cushion of advance payments on REA loans in an amount equal to two times the maximum annual debt service requirements.

The chancellor, adopting the formula in the REA bulletin as a guide, found the Cooperative had accumulated excessive revenues, within the meaning of T.C.A. sec. 65-2516, which had not been distributed as patronage refund, rate reductions, or prepayment of debt. The Court of Appeals affirmed this action of the chancellor and we concur.

As to the disbursements of excessive revenues, the chancellor held former members and heirs of deceased members be paid a cash refund and that members presently served be given a rate reduction. The Court of Appeals modified this holding by allowing the Cooperative in its discretion to pay excessive revenues or any part thereof on its indebtedness prior to maturity. We do not fully agree for the following reasons:

The Cooperative, by contract, obtains electricity for resale to its members from the Tennessee Valley Authority (TVA), an agency of the United States Government.

A provision of this contract pertinent to the issues here provides that the Cooperative will distribute excessive revenues either to reduce rates or retire debt prior to maturity. Under this contract the Cooperative has, in effect, disclaimed one of the statutory methods allowed in the distribution of excessive revenues; that is, the payment of patronage rebates. The Cooperative in the trial court and in the Court of Appeals took the position it could not distribute excess revenues as patronage refund since to do so would be violative of its contract with TVA. The trial court and the Court of Appeals did not accept this argument.

T.C.A. sec. 65-2508 enumerates the powers of the Cooperative and (k) of this statute is as follows:

To make any and all contracts necessary or convenient for the full exercise of the powers in this chapter granted, including, but not limited to, contracts with any person, federal agency, or municipality, for the purchase or sale of electric energy and, in connection with any such contract, to stipulate and agree to such covenants, terms, and conditions as the board of trustees may deem appropriate, including covenants, terms and conditions with respect to resale rates, financial and accounting methods, services, operation and maintenance practices, and, *consistent with sec. 65-2516, the manner of disposing of the revenues of the properties operated and maintained by the cooperative;* (Emphasis supplied.)

No question is made that this entire contract with TVA is other than a lawful contract and that such is especially authorized by the above statute. The argument is that the Cooperative cannot contract to disclaim any statutory

options it has in the distribution of excessive revenues and this section is void, or at least it would be inequitable to allow its enforcement under the circumstances of this case.

Under T.C.A. sec. 65-2509, the Cooperative is authorized to adopt by-laws not inconsistent with Chapter 25. T.C.A. Sec. 65-2516 provides excessive revenue shall be distributed and then this statute says; ''* * * and in the manner, provided in the by-laws.'' Article 8 of the corporate by-laws, which provides that excessive revenues shall be distributed by the same method set out in the statute, also stipulates that such distribution ''shall be subject to the contractual obligations of the Cooperative.''

█ As we have noted in this opinion, the statutes, in effect, make it mandatory upon the Cooperative to distribute excessive revenues. The statute does allow the Cooperative discretion within the enumerated methods on how the distribution shall be made. We agree the Cooperative by contract or otherwise cannot distribute excessive revenues in any manner not authorized by the statute, but we know of no reason why the Cooperative, acting pursuant to its by-laws and its clear statutory authority, (T.C.A. sec. 65-2508), to contract in regard to the manner of disposing of its revenues, cannot contract to distribute excessive revenues by one or more of the operational methods authorized to the exclusion of the other optional methods.

We think this contract with TVA in regard to the distribution of excessive revenues is valid and binding on the Cooperative and the court in the distribution of excessive revenues.

■ The chancellor indicated the Cooperative would be required to distribute excessive income at the end of each fiscal year. The statute (sec. 65-2516) is mandatory in regard to the distribution of excessive revenues, but we do not construe the statute to require such be completed at the end of each fiscal year. On this point of the timing of the distribution of excessive revenues, in view of the many variable elements involved in keeping the Cooperative financially sound and at the same time furnish its members electricity at the lowest feasible rates, not unduly varying from year to year, we would construe the statute to allow the officers of the Cooperative discretion as to the completion of the distribution. The court should not interfere unless the Cooperative fails to implement a program required by the statute in the distribution of excessive revenues. We think justice will be served by remanding this cause to the trial court for that court to require the Cooperative to submit a plan to the court for the distribution of excessive revenues, using REA Bulletin 1-7 as a guide in determining the amount of excessive revenues. We also think full justice can be done requiring this plan to include the operation of the Cooperative up to its last fiscal year, the same being June 30, 1969. In submitting the plan the Cooperative shall have the two statutory methods remaining open to it; that is, rate reduction, prepayment of debt or combination thereof. Also, the plan submitted shall take into consideration a rate reduction necessary to avoid accumulation of undue excessive revenues in the future.

■ As defenses to this suit the Cooperative alleged the complainants had no standing to bring this suit as a class action, nor have they exhausted their internal corporate remedies. In this opinion we do not deem it neces-

sary to go into these matters, since we agree with the chancellor and the Court of Appeals in their holdings thereon which were adverse to the Cooperative.

The chancellor ordered a reference to the Master for, among other things, a determination of the amount of fees to be allowed complainants' counsel of record. We think complainants' counsel has rendered valuable service to the Cooperative and its members and their fees should be paid by the Cooperative. See *Grant v. Lookout Mountain Company*, 93 Tenn. 691, 285 S.W. 90, 27 L.R.A. 98 (1894), and 152 A.L.R. 914 (1944).

MR. JUSTICE CRESON agrees with the substantive portion of this opinion but dissents to the part of the opinion holding that this action can be maintained as a class action.

The cause is remanded to the Chancery Court of Meigs County for further proceedings consistent with this opinion.

BURNETT, CHIEF JUSTICE, and CHATTIN and HUMPHREYS, JUSTICES, concur.

CRESON, JUSTICE, concurs in part, dissents in part.