R. T. FRENCH, Coy E. Davis, Lake Stals-
worth, Charlie Reece, Hobart Ramsey,
Wallace Roach, T. H. Northern, L. G.
French, Robert Ely, F. A. Talley, J. C.
Denton, James Foster and C. A. Bales,
Plaintiffs-Appellees (Cross-Appellants),

v.

APPALACHIAN ELECTRIC COOPERA-
TIVE, Defendant-Appellant
(Cross-Appellee),

v.

TENNESSEE VALLEY AUTHORITY,
Defendant-Intervenor.

Court of Appeals of Tennessee,
Eastern Section.

Oct. 3, 1978.

Certiorari Denied by Supreme Court
April 2, 1979.

B. J. Ramsey, Jr., O. D. Bridges, and John R. Conkin, Jefferson City, for plaintiffs-appellees (cross-appellants).

J. D. Hale, Clyde W. Key, Knoxville, for defendant-appellant (cross-appellee).

Herbert S. Sanger, Jr., Gen. Counsel; James E. Fox, Asst. Gen. Counsel; Edgar H. Drum, Tennessee Valley Authority, as amicus curiae.

LEWIS, Judge.

## OPINION

Plaintiffs, R. T. French, et al, are thirteen-member customers of defendant, Appalachian Electric Cooperative. They filed suit on May 15, 1964, to require defendant to distribute, in cash, alleged accumulated revenues. Tennessee Valley Authority (hereafter TVA), who was allowed to intervene as a party defendant, alleged that if the relief sought by plaintiffs was granted it would "impair the obligations of the power contract" between TVA and defendant and "greatly damage and interfere with petitioner's [TVA] power program throughout the Tennessee Valley Region". TVA did not appeal.

On the 9th of May, 1977, the Chancellor entered a final decree, the pertinent parts of which are:

"1. That the Appalachian Electric Cooperative should be and is reprimanded for having excess general funds in the years 1958–1961, inclusive, and 1963 and 1964, inclusive, which was not in the best interests of the members of the Cooperative.

"2. Since for the years 1965–1972, inclusive, the Appalachian Electric Cooperative has had insufficient general funds, I do not feel that a penalty or distribution of funds to customers would be justified.

"3. In order to prevent the accumulation of excess general funds by Appalachian Electric Cooperative in the future, it is ordered to report to the Chancery Court of Jefferson County on September 15th of each year the amount of general funds at the preceding June 30. Should excess general funds be found to exist, the Court will take corrective action. The Court reserves jurisdiction to take such action as it deems expedient with reference to said reports.

"4. As noted in my Special Master's Report, the total utility plant cost of the Appalachian Electric Cooperative increased $6,117,029.31 over the period July 1, 1957 through June 30, 1972. During the same period the actual principal advanced on REA obligations to the Appalachian Electric Cooperative increased from $2,277,740.06 at June 30, 1957 to $4,275,226.18 at June 30, 1972, or an increase of $1,997,486.12. Therefore, earnings from the Cooperative of $4,119,-543.19 are evidently being used to finance additions to utility plant. I question the propriety of this use of earnings.

"5. That the various contracts between the defendant and the Tennessee Valley Authority filed herein are ratified by the Court.

"6. The Court deems that this suit has inured to the benefit of the members of the defendant, and, accordingly that the plaintiffs are entitled to an allowance, to be paid by the defendant on account of plaintiffs' attorneys fees and costs incurred in the prosecution of this suit. The Court fixes the following amounts, for which judgment is entitled against the defendant, to-wit:

"(a) To Russell and Purkey, CPAs, for their services in preparing an audit report for the Special Master, in the sum of $5,097.87.

"(b) To the Estate of Clarence Bales, deceased attorney, for his legal services rendered herein, the sum of $10,000.00.

"(c) To B. J. Ramsey, O. D. Bridges and John Conkin, attorneys for the plaintiffs, the sum of $1,293.70 for expenses incurred by them, plus the sum of $40,-000.00 for their professional services rendered as attorneys for plaintiff herein.

"(d) To Neal Roach as Special Master the sum of $1500.00.

"7. That the defendant shall pay the costs of the cause, for which execution may issue if necessary for collection of said court costs as well as the expenses and attorneys fees hereinabove allowed.

Both plaintiffs and defendant appeal. We first discuss plaintiffs' assignments of error:

1. "The Court erred in allowing the Defendant, Appalachian Electric Cooperative, to carry the sum of $807,162.00 on its books as a liability, when in fact, that sum was simply included in general funds and there were no trust or reserve accounts set up by the Cooperative. The Cooperative stopped collecting the members' contribution to debt service in 1961, but the sum of $807,162.00 is still carried on the Cooperative's books."

2. "The Court erred in allowing the Cooperative to show certain items on its books for depreciation and other expenditures without any showing that there was any relationship between the amounts listed for each item and the condition of the plant or the funds actually expended."

3. "The Court erred in allowing the Defendant to submit audit reports which did not include accounts receivable."

Plaintiffs, by their first assignment, contend that the $807,162.00 which was carried on the books of Defendant as a liability and was accumulated by the collection of amortization charges from its members has never been applied toward payment of its Rural Electrification Administration debt and that this fund is still on hand and should be refunded to the members.

They contend that because this fund is still carried on the balance sheet this somehow establishes that the fund was not used toward payment of the debt but was either still on hand or has wrongfully been used in additions to the electrical plant.

From a careful review of this record, we are unable to find any evidence to support plaintiffs' contention. The witnesses who testified on this point, including plaintiffs' witnesses, testified that it was quite appropriate after these funds had been collected and utilized to continue to reflect them on the balance sheet in exactly the manner that defendant carried them for the purpose of showing their source.

We find nothing in the testimony that establishes a basis for the plaintiffs' assertion that the amortization collections were wrongly used or were not applied to debt service or that the funds were still available and at the defendant's disposal.

This assignment is without merit.

■ They contend by their second assignment that Defendant was not entitled to deduct "depreciation and other expenditures" without showing a relationship between each item on which depreciation was taken and the condition of the plant or the funds actually expended.

The record shows that the defendant has continuously kept its books in accordance with the uniform system of accounting adopted and approved by the Federal Energy Regulatory Commission and that since its inception defendant has accrued depreciation on its physical assets in strict accordance with the depreciation schedules adopted and approved by the Federal Energy Regulatory Commission.

There is no other evidence in the record relating to the matter of depreciation. As is pointed out in the defendant's brief, the reasonableness or unreasonableness of depreciation taken by the defendant was never made an issue by any pleading in the case. We find that the depreciation schedules promulgated and recommended by the Federal Power Commission and its successor, the Federal Energy Regulatory Commission, are reasonable as guidelines for cooperatives such as the defendant.

This assignment is without merit.

■ Plaintiffs, by their third assignment, do not purport to show how the Chancellor's actions prejudiced their rights. This Court will assume the correctness of the Chancellor's decision where the assignment of error does not state how the Chancellor's actions prejudiced the plaintiffs' rights.

We next discuss defendant's assignments:

1. "The Court erred in holding that this suit had inured to the benefit of the members of the defendant, and that the defendant should be required to pay the fees of plaintiff's attorneys."

2. "The Court erred in reprimanding the defendant and in taxing the defendant with court costs and expense."

3. "The Court erred in requiring the defendant to prepare and file with the Court written annual reports and in retaining jurisdiction of the case for an indefinite time in the future."

4. "The Court erred in including in the defendant's reserves at the end of each fiscal year the amount of the membership dues which constituted a liability and are refundable to the members upon termination of their membership."

5. "The Court erred in not dismissing this suit in its entirety and taxing the plaintiffs and the sureties on their prosecution bond with the costs thereof."

Since both defendant and plaintiff have seen fit to discuss these assignments together, we will do likewise.

Defendant was organized pursuant to the provisions of the "Electric Cooperative Law", T.C.A. § 65–2501, et seq. (hereafter referred to as the "Cooperative Law"). Pursuant to the "Cooperative Law", defendant operated a cooperative non-profit membership corporation for the purpose of supplying, promoting and extending the use of electric energy.

Cooperatives such as the defendant are given broad powers and are granted the discretion to distribute electric revenues in excess of those required for the purposes specified,

"* * *, either (1) as patronage refunds prorated in accordance with the patronage of the cooperative by the respective members paid for during such fiscal year, or (2) by way of general rate reductions, or (3) by a combination of such methods. Nothing herein contained shall be construed to prohibit the payment by a cooperative of all or any part of its indebtedness prior to the date when the same shall become due." § 65–2516(F), T.C.A.

The "Cooperative Law" also empowers the defendant to contract with TVA for the purchase or sale of electric energy and in connection therewith to

" * * * agree to such covenants, terms and conditions as the Board of Trustees may deem appropriate, including covenants, terms and conditions with respect to resale rates, financial and accounting methods, services, operation and maintenance practices and, consistent with § 65–2516, the matter of disposing of the revenues of the properties operated and maintained by the cooperative. * * *." T.C.A. § 65–2508(k).

The defendant, since its inception, has purchased power from TVA under a standard TVA power contract. The present contract establishes the retail rates and strictly controls the use of defendant's electric revenue. It requires the defendant to operate on a non-profit basis and to maintain and operate its electric system and financial records in strict accordance with the provisions of the contract. Under the contract, the defendant must supply TVA with a financial report of its utility system operation each year and to have its financial statements examined each year by a certified public accountant. The contract sets the resale rate schedule to be charged by the defendant and provides "if the rate and charges in effect * * * are more than sufficient" TVA and defendant "shall agree upon a reduction in * * * rates and charges" and defendant "shall promptly put such reduced rates and charges into effect". As authorized by the "Cooperative Law" and required by its contract with TVA, defendant has distributed excess revenues solely by way of rate reductions. From June 30, 1947, to August 1, 1963, TVA recommended on four (4) separate occasions, and defendant implemented, rate reductions to reduce reserves.

On February 12, 1962, REA issued Bulletin No. 1–7 setting forth its recommendation with respect to the amount of "general funds" or "reserves" that would be considered reasonable for an electric cooperative to retain without a reduction in rates in any one of three ways prescribed by the "Cooperative Law" under which defendant was organized and by which its activities are regulated. Bulletin No. 1–7 provides that reserves for working capital in the amount of six (6%) percent of "total plant" were reasonable; that reserves for unusual and unpredictable requirements and contingencies in the amount of six (6%) percent of "total plant" were reasonable; and that reserves for possible storm damage and other acts of God not covered by insurance and for possible loss of revenue from large and uncertain loads should not exceed three (3%) percent of "total plant". This permitted defendant to retain in reserve funds fifteen (15%) percent of "total plant". In August of 1969 this was reduced to eight (8%) percent of "total plant".

"Total Plant" was defined by the Rural Electrification Administration to mean the total undepreciated cost to defendant of its entire electric distribution system.

REA bulletins relating to reserves and the contracts between cooperatives such as the defendant and TVA were upheld in their entirety in *Shadow et al v. Volunteer Electric Cooperative*, 223 Tenn. 552, 448 S.W.2d 416 (1969).

The audit report, submitted by certified public accountants employed by the Special Master and which was adopted by the Master, showed that the defendant's total utility plant increased more than Six Million Dollars from June 30, 1957 to June 30, 1972, and that defendant had insufficient reserves or general funds at the end of the fiscal years 1957 and 1962 and from 1965–1972, inclusive, and had excessive general funds for the years 1958 to 1961, inclusive, and in 1963 and 1964.

At the end of the fiscal year June 30, 1962, the defendant's reserves showed a deficit in the amount of $140,232.46. At the end of the fiscal year June 30, 1963, there were excess reserves in the amount of $99,119.17. Defendant contends this should be reduced by the refundable membership fees of $63,915.00 which would actually reduce the excess to $32,204.17. At the end of the fiscal year 1964 there were excess reserves in the amount of $31,305.99, which it contends should be reduced by refundable membership fees of $71,780.00 which would convert this excess to a deficiency of $40,-

474.01. The membership fees are refundable and, as such, are liabilities. The excess reserves should be reduced by the refundable membership fees.

The complaint in the instant case was filed May 15, 1964, demanding that the Trustees take corrective action with respect to the elimination of reserves disclosed by the audit report for the fiscal year ending June 30, 1963, was preceded by a general rate reduction which became effective August 1, 1963. This was some ten (10) months prior to the filing of the complaint. The August 1, 1963 general rate decrease converted excess revenues into a deficit. At no time since that date has the defendant had any excess reserves or general funds out of which to make a refund to members in any one of the three ways set out in the "Cooperative Law". The corrective action which produced this result was taken by the defendant before the instant suit was filed.

The defendant has continuously kept its books in accordance with the uniform system of accounting adopted and approved by the Federal Energy Regulatory Commission and has accrued depreciation on its physical assets in accordance with the depreciation schedules adopted and approved by the Commission.

On August 5, 1960, defendant received the accountant's annual audit report for the fiscal year ending June 30, 1960, which disclosed that it reserves had reached 19.9 percent of total plant cost. Effective September 1, 1960, defendant granted a rate reduction by removing the ten (10%) percent surcharge on commercial accounts which resulted in an annual savings of approximately $40,000.00.

Upon receipt of the audit report for the fiscal year ending June 30, 1961, a further rate reduction was granted removing all amortization charges effective September 1, 1961. This reduction reduced reserves covered by REA Bulletin No. 1–7 to 9.9 percent of total plant cost for the fiscal year ending June 30, 1962.

Effective August 1, 1963, a further general rate reduction was granted, which was some ten (10) months prior to the filing of the instant suit and this rate reduction wiped out completely any excess reserves or general funds. The defendant has operated continuously since that time without accumulating any excess reserves.

While the learned Chancellor questions the "propriety" of the use of earnings to finance additions to the utility plant, the "Cooperative Law" provides that revenues may be used to "finance, or to provide a reserve for the financing of, the construction or acquisition by the cooperative of additional facilities to the extent determined by the Board of Trustees". T.C.A. § 65–2516(C). Further, the contract between TVA and the defendant, which was approved by the Chancellor, provides that surplus revenues "may be used for new electric system construction". This type of contract was approved in *Shadow*, supra.

■■■ The Chancellor's attempt to retain jurisdiction to review the defendant's financial decision is clearly erroneous. He is attempting to substitute his judgment for that of the defendant. "It is not the function of the courts to interfere with the internal workings of corporations in exercising their discretion within legal limits." *Gruber v. Chesapeake & Ohio Railway*, 158 F.Supp. 593. The Courts will not substitute their judgment for that of the board of directors where the board has acted in good faith within their corporate powers. *Range v. Tennessee Burley Tobacco Growers Association*, 41 Tenn.App. 667, 298 S.W.2d 545 (1955), cert. denied 355 U.S. 813, 78 S.Ct. 11, 2 L.Ed.2d 30 (1958); *Pace v. Garbage Disposal Dist. of Washington Co.*, 54 Tenn.App. 263, 390 S.W.2d 461, 463 (1965).

"In view of the many variable elements involved in keeping a Cooperative financially sound and at the same time furnish its members electricity at the lowest feasible rates, not unduly varying from year to year, we would construe the statute to allow the officers of the Cooperative discretion as to the completion of the distribution. The court should not interfere unless the Cooperative fails to implement

a program required by the statute in the distribution of excessive revenues." *Shadow, et al v. Volunteer Electric Cooperative*, supra.

■ It is abundantly clear that courts should not attempt to obtain jurisdiction over discretionary decisions of cooperatives such as the defendant simply because the cooperatives may fail to carry out their responsibilities sometime in the future.

The membership may bring an appropriate action against the defendant if at some time in the future the defendant fails to properly distribute its revenues.

■ There has been no showing that there has been a failure on the part of the defendant to implement a program for distribution of excess revenues. On the contrary, the record shows that such a program has been implemented.

Even though the Chancellor found that no distribution of funds would be justified, he nevertheless determined that this suit had inured to the benefit of defendant's members and that defendant should pay the plaintiffs' attorneys fees and expenses, fees and expenses incurred by the CPAs, and fees and expenses of the Special Master.

The Chancellor found that rate reductions were not appropriate and were not ordered. The defendant had voluntarily implemented reductions for excess revenues prior to the time this suit was brought. No affirmative relief on behalf of the plaintiffs was ordered. There are no funds out of which to pay attorneys fees and expense, except for the general funds. Plaintiffs were not entitled to, nor did they receive, affirmative relief. No benefits inured to the members of the Appalachian Electric Cooperative as a result of this suit.

■ Further, attorneys fees cannot be awarded to litigants when there is no property or funds before the court which have been protected or preserved out of which attorneys fees can be paid. *Gillespe v. Federal Compress & Warehouse Co.*, 37 Tenn. App. 476, 265 S.W.2d 21 (1953); *Pierce v. Lawrence*, 84 Tenn. 572, 1 S.W. 204 (1886).

" * * * The well nigh universal rule is that where counsel fees are awarded by the court the fee allowed must be paid out of a specific fund recovered or out of specific property protected against threatened loss, or it must rest in contract, either express or implied.

* * * * * *

"Since there is no fund or property here, either impounded or protected by any order of the court, upon which a lien can be declared, and no contract to be enforced it results that the decree of the chancellor must be held erroneous." *Southern v. Beeler*, 183 Tenn. 272, 195 S.W.2d 857 (1946).

■ Our public policy is opposed to the allowance of counsel fees of the successful party against the defeated party when there is no property in court. *Gillespe v. Federal Compress & Warehouse Co.*, supra.

■ In the instant case plaintiffs were not successful in obtaining affirmative relief and further there was no property or fund before the court out of which fees could be paid.

The judgment of the Chancellor is affirmed insofar as it sustains the contract between the defendant and Tennessee Valley Authority and in all other respects is reversed.

The fees of Russell and Purkey, CPAs, for their services in preparing an audit report for the Special Master in the sum of $5,097.87 and the Special Master's fee in the sum of $1500.00 shall be taxed as a part of the costs.

The costs will be taxed one-half to plaintiffs and one-half to defendant, Appalachian Electric Cooperative.

PARROTT, P. J., and GODDARD, J., concur.