IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
February 10, 2005 Session

# FRANKLIN CAPITAL ASSOCIATES, L.P. v. ALMOST FAMILY, INC. f/k/a CARETENDERS HEALTH CORPORATION

**Appeal from the Chancery Court for Williamson County**
**No. 26976     Robert E. L. Davies, Judge**

---

**No. M2003-02191-COA-R3-CV - Filed November 29, 2005**

---

This appeal involves a dispute regarding a shareholders agreement negotiated as part of a merger between National Health Industries, Inc. and Senior Services Corporation. The merged companies became Caretenders Health Corporation. Franklin Capital Associates, a shareholder of Caretenders, filed this action against Caretenders alleging, *inter alia*, breach of the parties' shareholders agreement. Franklin contends Caretenders failed to use its best efforts to register the stock issued in the merger. The trial court found Caretenders liable for failing to use its best efforts to register the shares under any registration form available, and awarded damages of $984,970 to Franklin. Caretenders appeals contending the trial court erred by: (1) not requiring Franklin to prove Caretenders acted in bad faith, (2) determining Caretenders must use best efforts to register the stock under any registration form available, and (3) applying a 25% "block discount" to the net proceeds, rather than the price per share. Franklin appeals the denial of their request for prejudgment interest. We affirm the trial court on the first two issues and the denial of prejudgment interest to Franklin but find the trial court incorrectly calculated the "block discount."

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed in Part and Reversed and Modified in Part**

FRANK G. CLEMENT, JR., J., delivered the opinion of the court, in which WILLIAM B. CAIN and PATRICIA J. COTTRELL, JJ., joined.

Sheryl G. Snyder, Louisville, Kentucky and John R. Wingo, Nashville, Tennessee, for the appellant, Almost Family, Inc., f/k/a Caretenders Health Corp.

Ames Davis, Nancy S. Jones and Thomas H. Lee, Nashville, Tennessee, for the appellee, Franklin Capital Associates, L.P.

**OPINION**

The matters at issue arise from the merger of National Health Industries, Inc., a privately-held company, into Senior Services Corporation, a publicly-traded company. The surviving entity became Caretenders Health Corporation.[1] One of the participants in the merger was Franklin Capital Associates, a limited partnership venture capital fund, which was a shareholder and investor in National.

National, in an effort to raise needed capital, began negotiating a possible merger with Senior Services Corporation in the fall of 1990. Franklin initially opposed the proposed merger. Negotiations ensued following which Franklin withdrew its opposition to the merger. There were several reasons for this. Franklin would be paid $545,750 as repayment of a debt instrument owed to Franklin by National. Additionally, Franklin would receive 890,349 shares of Caretenders' common stock in exchange for Franklin's 811,000 shares of preferred stock in National. There was yet another reason Franklin agreed to the merger. This was because the merger afforded Franklin the means of exchanging its shares in a privately held company, National, for shares in a publicly-traded company, Caretenders. As a consequence, once the registration of the additional shares as secondary stock offering was approved by the Securities and Exchange Commission (SEC), Franklin would have a substantially larger market in which to sell its shares.

The proposed merger caught steam in December of 1990 when the parties entered into a merger agreement and the board of directors of Caretenders adopted a resolution to register the additional shares needed for the merger. The merger was finalized on February 5, 1991, when the parties entered into a shareholders agreement. In pertinent part, the shareholders agreement provided that Caretenders would use its best efforts to register the shares being issued in the merger on SEC Form S-3 for sale to the public as expeditiously as possible in such a manner as to permit the sale of the shares.

In order to register shares such as those at issue, the issuer, in this case Caretenders, must file a registration statement with the SEC. The issuer has the option to register shares using a variety of forms. The purpose of the forms is to disclose material information about the issuer to the investing public prior to the shares being sold in the open market. The two SEC forms relevant to this case are "Form S-1" and "Form S-3." Form S-1 is significantly more comprehensive than Form S-3. Issuers must use Form S-1 when they initially register shares for sale to the public. Issuers such as Caretenders that have previously registered shares may again use Form S-1 to register additional shares to be issued. Form S-1 must be accompanied by audited financial statements for the issuer and all significant subsidiaries, as well as other detailed information about the issuer. A Form S-1 application undergoes a "flyspecking process," where a financial analyst, staff attorney and an accountant each give the application a full review. As an alternative, Form S-3 may be used by companies that have previously registered shares in order to register additional shares. Form S-3 is

---

[1]The corporate name of Caretenders Service Corporation has recently been changed to Almost Family, Inc. We refer to the corporation as Caretenders to minimize confusion.

generally more expedient and provides a less burdensome alternative, but Form S-3 may only be used to register additional shares by issuers that qualify.

All publicly-traded companies are required to make periodic disclosures of material information to the investing public pursuant to the Securities Exchange Act of 1934. Annual reports are to be filed along with audited financials. Additionally, interim reports of material changes are required of publicly-traded companies such as Caretenders. Because of these disclosures, the SEC has on file documentation required for the Form S-1 registration. Accordingly, issuers that have provided annual and periodic reports as required may be eligible to use the less onerous registration process afforded by Form S-3. If the issuer does not qualify then it must use Form S-1 to register the additional shares, unless and until it comes into compliance.

Prior to the close of the merger, however, it became apparent that one of National's subsidiaries could not produce audited financial statements, which would prevent Caretenders from using Form S-3 to expedite registration of the shares and thus delay the registration. The lead auditor for Caretenders advised that seeking a waiver would be a "waste of time." Additionally, Caretenders' counsel, Waring Cox, recommended that a request of a waiver include an assurance that the required financial statements for the subsidiary would be filed no later than June 30, 1991 along with Caretenders' annual report, known as a Form 10-K filing. Caretenders, however, requested a waiver from the SEC in February of 1991 without assuring that the required financial statements for the subsidiary would be filed with the annual report. The SEC summarily and immediately dismissed the request for waiver and informed Caretenders the registration statement for the secondary offering would not be effective until all required financial statements were received.

The rejection of the requested waiver also prevented Caretenders from using Form S-3 for an expedited registration until the fall of 1991, provided it timely filed its Form 10-K annual report in June of 1991.[2] Caretenders, however, failed to file its 10-K report by the June deadline. The subsequent late filing of Caretenders' 10-K annual report further delayed matters by preventing registration via Form S-3 until July 1992, at the earliest.

Caretenders filed its 10-K annual report one month late, in July 1991. The 10-K filing contained most of the disclosures and audited financial statements needed to file the more involved SEC Form S-1 registration statement. Caretenders' tardy filing of the 10-K annual report in July of 1991 precluded the use of Form S-3 for several months. Thereafter, in October of 1991, Caretenders represented to Franklin that it would seek registration via SEC Form S-1, the more comprehensive disclosure. Three months later, January of 1992, Caretenders submitted a follow-up letter to Franklin reiterating its new plan and stating its registration package was ready to file. Caretenders further represented in the January letter that it believed the shares would be freely marketable by January of 1992. Caretenders, however, failed to submit the S-1 registration to the SEC until March

_____

[2] Only those registrants which have complied fully with the SEC reporting requirements for at least one year and are current on their quarterly (10-Q) and annual reports (10-K) to the SEC can use the Form S-3.

20, 1992. By June of 1992, while the S-1 registration was being reviewed by the SEC pending approval, Caretenders, once again, failed to timely file its annual report with the SEC.

Frustrated by Caretenders' repeated delays in filing its registration application and repeated failures to make timely filings of its annual reports with the SEC, which precluded Franklin from selling its shares on the open market, Franklin began selling some of its shares, pursuant to SEC Rule 144, in February of 1993. Subject to strict restrictions on the timing and amount of sales of "unregistered shares," Rule 144 permits the sale of "unregistered shares" of a publicly-traded company after a two year holding period. Franklin received $1,304,333 in consideration for the shares it sold pursuant to Rule 144.

On April 23, 1993, more than two years after the parties entered into the merger agreement and shareholders agreement, Caretenders' registration statement was approved by the SEC and thus the shares were finally registered.

Franklin filed this action claiming Caretenders breached the shareholders' agreement by failing to use its best efforts to expediently register the shares.[3] The trial court found that Caretenders breached the agreement by not using its best efforts to register the shares as expeditiously as possible. The damages sustained by Franklin were determined by adopting the conversion measure of damages. The court set the value of Franklin's shares based on a price per share of $2.94. From that amount, it then deducted the proceeds Franklin received for the sale of its shares pursuant to SEC Rule 144. The trial court then applied a block discount of 25%. This formula produced a sum of $984, 970, which the trial court awarded to Franklin as damages. The trial court denied Franklin's request for prejudgment interest. Both parties appeal.

## STANDARD OF REVIEW

The standard of review of a trial court's findings of fact is *de novo* and we presume that the findings of fact are correct unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 296 (Tenn. Ct. App. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999). Where the trial court does not make findings of fact, there is no presumption of correctness and we "must conduct our own independent review of the record to determine where the preponderance of the evidence lies." *Brooks v. Brooks*, 992 S.W.2d 403, 405 (Tenn. 1999). We also give great weight to a trial court's determinations of credibility of witnesses. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997); *B & G Constr., Inc. v. Polk*, 37

---

[3] Franklin filed a prior action against Caretenders on January 26, 1994, which was voluntarily dismissed. The present complaint was filed on April 11, 2000. Caretenders also asserted a claim for fraud and misrepresentation, which were dismissed as being barred by the statute of limitations. Franklin did not appeal the dismissal of those claims.

S.W.3d 462, 465 (Tenn. Ct. App. 2000). Issues of law are reviewed *de novo* with no presumption of correctness. *Nelson v. Wal-Mart Stores, Inc.*, 8 S.W.3d 625, 628 (Tenn. 1999).

## ANALYSIS

Caretenders contends the trial court erred by not conducting its judicial review of Caretenders' management decisions based upon what Caretenders describes as "the good faith business judgment rule." It also contends proof of bad faith is an essential element of that rule and Franklin failed to prove bad faith. Additionally, Caretenders contends its duty was to use best efforts to file for registration of the shares using SEC short Form S-3 and that it fulfilled that commitment.

The trial court ruled that the agreement of the parties was for Caretenders to use best efforts to register the shares as expeditiously as possible and the duty was not restricted to the use of SEC Form S-3. The court further held that Caretenders failed to fulfill its contractual duties and, thus, was liable to Franklin for breach of contract. We find no error with the trial court's rulings.

## THE BUSINESS JUDGMENT RULE

Caretenders insists the trial court erred by failing to review its business decisions pursuant to what it identifies as the "good faith business judgment rule." We find this contention is misplaced.

Contrary to Caretenders' contention, the "business judgment rule," as it is called, does not apply in all actions where the judgment of the officers or directors of a corporation is at issue. *Summers v. Cherokee Children & Family Services, Inc.,* 112 S.W.3d 486, 528 (Tenn. Ct. App. 2002)*; Hall v. Tennessee Dressed Beef Co.*, No. 701-A-01-9510-CH-00430, 1996 WL 355074, \*6-7 (Tenn. Ct. App. November 25, 1996). Application of the business judgment rule is generally found in derivative actions.[4] *Id.* The business judgment rule, when it applies, provides "a presumption that in making a business decision the directors [and officers] of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest of the company." *Id.* (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984); *accord, Lewis on Behalf*

---

[4]As this court explained in *Lewis on Behalf of Citizens Sav. Bank & Trust Co. v. Boyd*, 838 S.W.2d 215, 221 (Tenn. Ct. App. 1992), a derivative action is "an extraordinary, equitable remedy available to shareholders when a corporate cause of action is, for some reason, not pursued by the corporation itself." (citing *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95, 111 S.Ct. 1711, 1716, 114 L.Ed.2d 152 (1991); *Lewis v. Graves*, 701 F.2d 245, 247 (2d Cir.1983); *Levine v. Smith*, 591 A.2d 194, 200 (Del. 1991); 13 W. FLETCHER, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 5941.10 (rev. perm. ed. 1994). The derivative action is a limited exception to the usual rule that the proper party to assert a corporate cause of action is the corporation itself, acting through its directors or a majority of its shareholders. *Lewis,* 838 S.W.2d at 220-21 (citing *Daily Income Fund, Inc. v. Fox*, 464 U.S. at 531-32, 104 S.Ct. at 836; *State v. Mitchell*, 58 S.W. 365, 368 (Tenn. 1899)). These actions include suits brought by one or more shareholders on a corporation's behalf to redress an injury sustained by, or to enforce a duty owed to, a corporation. *Lewis,* 838 S.W.2d at 220-221 (citing *Daily Income Fund, Inc. v. Fox*, 464 U.S. at 527-29, 104 S.Ct. at 834; *Bourne v. Williams*, 633 S.W.2d 469, 471 (Tenn. Ct. App. 1981); H. HENN & J. ALEXANDER, LAWS OF CORPORATIONS AND OTHER BUSINESS ENTERPRISES § 360, at 1045 (3d ed. 1983)).

*of Citizens Sav. Bank & Trust Co. v. Boyd*, 838 S.W.2d 215, 220-221 (Tenn. Ct. App. 1992)). The business judgment rule applies in shareholder suits for breach of a fiduciary duty to protect the directors from liability for decisions made in good faith in the course of the day-to-day business of running a corporation. 5 WILLIAM MEADE FLETCHER ET AL., FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 2104 (perm. ed., rev. vol. 1994). Under the business judgment rule, directors are not liable for honest errors or mistakes of judgment when they act without corrupt motive and in good faith. *See* 3A FLETCHER at § 1036; *Summers v. Cherokee Children & Family Services, Inc.,* 112 S.W.3d 486, 528-29 (Tenn. Ct. App. 2002)). As this court explained in *Hall*, under the business judgment rule, the duty of care required of directors and officers is "to act in good-faith and in the best interest of the corporation '[w]ith the care an ordinarily prudent person in a like position would exercise under similar circumstances. . . .'" *Hall*, 1996 WL 355074, at *6 (quoting Tenn. Code Ann. §§ 48-18-301(a), -403(a) (1995)); also citing *Neese v. Brown*, 405 S.W.2d 577, 580 (Tenn. 1964)). When the rule applies, Tennessee aligns itself with the jurisdictions recognizing and following the "business judgment rule." *Id.* (citations omitted).[5] However, if the plaintiff establishes the business judgment rule does not apply, the burden shifts to the directors or officers to establish that the act at issue satisfied the ordinary care standard. *Hall*, 1996 WL 355074, at *7 (citing 3A FLETCHER at § 1031).

Caretenders would have us believe the business judgment rule applies merely because this case involves a dispute between a corporation and one of its shareholders, regardless of the nature of the case. We respectfully disagree. This court has previously distinguished a shareholders derivative action from a shareholder's breach of contract action against the corporation. *See Wachtel v. Western Sizzlin Corp.*, 1986 S.W.2d 2, 5 (Tenn. Ct. App. 1998). In that matter the corporation insisted the trial court should have dismissed the shareholder's claim for special damages on the ground that his claims were identical to those of all the other shareholders. The corporation contended the shareholder's remedy was a shareholder's derivative action against the directors and officers on behalf of the corporation. The shareholder however convinced the court that his claim was based on contract, an employment contract, under which the company owed a special duty to him, a duty not owed to other shareholders. The court reasoned:

> "Stockholders may bring an action individually to recover for an injury done directly to them distinct from that incurred by the corporation and arising out of a special duty owed to the shareholders by the wrongdoer." *Hadden v. City of Gatlinburg*, 746 S.W.2d 687 (Tenn. 1988). In this case the wrongdoer is the corporation itself, but that fact does not change the general rule. Nor does the fact that the other

[5]When the business judgment rule applies, Tennessee has consistently followed a non-interventionist policy with regard to internal corporate matters. *Hall,* 1996 WL 355074, at *7. They have recognized that directors have broad management discretion. *Chism v. Mid-South Milling* Co., 762 S.W.2d 552, 556 (Tenn. 1988) (discretion in employing or discharging corporate officers); *Wallace v. Lincoln Sav. Bank*, 15 S.W. 448, 449-50 (Tenn. 1891). Accordingly, our courts have declined to substitute their judgment for that of a corporation's board of directors when the board has acted in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes. *French v. Appalachian Elec. Coop.*, 580 S.W.2d 565, 570 (Tenn. Ct. App. 1978); *Range v. Tennessee Burley Tobacco Growers Ass'n*, 298 S.W.2d 545, 549 (Tenn. Ct. App. 1955).

shareholders may have suffered the same harm in proportion to the number of shares they owned.  The cause of action for the other shareholders would be against the directors for violating their fiduciary duty to take the corporation public. [The shareholder's] cause of action is against the corporation for breaching his employment contract.  The loss he alleges is a consequence of that breach.

*Wachtel*,  986 S.W.2d at 5.  Although Franklin is a shareholder and its claim against Caretenders pertains to its shares, Franklin's cause of action pertains to its individual contractual rights, which are distinct from those of other shareholders.[6]  We therefore conclude the business judgment rule has no application to the breach of contract action at bar.[7]

## THE AGREEMENT

The trial court found two of the parties' agreements relevant and material to Franklin's breach of contract claim.  The merger agreement, dated December 19, 1990, and the shareholders agreement, dated February 5, 1991.  An additional document the trial court considered relevant and material was the minutes of the board of directors of Caretenders meeting in December of 1990.

The cardinal rule of contract interpretation is that the court must attempt to ascertain and give effect to the intention of the parties. *See Winfree v. Educators Credit Union*, 900 S.W.2d 285, 289 (Tenn. Ct. App. 1995); *Breeding v. Shackelford*, 888 S.W.2d 770, 775 (Tenn. Ct. App. 1994); *Rainey v. Stansell*, 836 S.W.2d 117, 118 (Tenn. Ct. App. 1992); *Park Place Ctr. Enters., Inc. v. Park Place Mall Assocs.*, L.P., 836 S.W.2d 113, 116 (Tenn. Ct. App. 1992). In attempting to ascertain the intention of the parties, the court must examine the language of the contract, giving each word its usual, natural, and ordinary meaning. *See Wilson v. Moore*, 929 S.W.2d 367, 373 (Tenn. Ct. App.1996); *Rainey*, 836 S.W.2d at 119. Additionally, the court may consider the situation of the parties, the business to which the contract relates, the subject matter of the contract, the circumstances surrounding the transaction, and the construction placed on the contract by the parties in carrying out its terms. *See Penske Truck Leasing Co. v. Huddleston*, 795 S.W.2d 669, 671 (Tenn. 1990); *New Life Corp. v. Thomas Nelson, Inc*., 932 S.W.2d 921, 925 (Tenn. Ct. App. 1996); *Minor v. Minor*, 863 S.W.2d 51, 54 (Tenn. Ct. App. 1993). When the language of the contract is plain and unambiguous, the court must determine the parties' intention from the four corners of contract, interpreting and enforcing it as written. *See Koella v. McHargue*, 976 S.W.2d 658, 661 (Tenn. Ct.

---

[6]Whether a suit against a corporation by one of its shareholders is properly brought as an individual action turns on whether the plaintiff has suffered an injury distinct from one incurred by the corporation. *Grogan v. Garner,* 806 F.2d 829, 834 (C.A.8 (Mo.) 1986).  As one commentator has observed, "[i]f the injury is one to the plaintiff as a stockholder and to him individually, and not to the corporation, as where the action is based on a contract to which he is a party, or on a right belonging severally to him, or on a fraud affecting him directly, it is an individual action." *Id*. (quoting 12B FLETCHER CYCLOPEDIA CORPORATIONS § 5911 (Perm. Ed. 1984); *see also Gieselmann v. Stegeman*, 443 S.W.2d 127 (Mo. 1969)).

[7]As Caretenders' "bad faith" argument was a component of its "good faith" business judgement rule argument, that issue is now moot and will not be discussed.

App. 1998); *Gates, Duncan & Vancamp Co. v. Levatino*, 962 S.W.2d 21, 25 (Tenn. Ct. App. 1997); *Bokor v. Holder*, 722 S.W.2d 676, 679 (Tenn. Ct. App. 1986).

The parties entered into the merger agreement in December of 1990. Section 1.3(f) of the merger agreement provides in pertinent part, "Distributable Shares received by National shareholders will be registered pursuant to the Securities Act of 1933 as expeditiously as possible after the merger at Senior's expense." That same month the board of directors of Caretenders authorized the filing with the SEC of a registration statement on behalf of the corporation on Form S-1, or any other applicable form, as soon as practicable after the merger. The resolution provided as follows:

> RESOLVED, that the proper officers of the Corporation be, and they hereby are, severally authorized and empowered to prepare, execute and file with the Securities and Exchange Commission a Registration Statement in the name and on behalf of the Corporation on Form S-1, or any other applicable form, and any exhibits, papers, documents or amendments (including post-effective amendments) thereto (the "Registration Statement"), under the Securities Act of 1933, as amended, covering the Shares as soon as practicable after the merger of NHI and the Merger-Sub and that the Chief Executive Officer and Chief Financial Officer of the Corporation are hereby authorized, individually, in any and all capacities (including as attorneys-in-fact of the Corporation's officers and directors) to sign such Registration Statement and any amendments thereto (including post-effective amendments) and to execute any documents in connection therewith;

Three months later the parties entered into the shareholders agreement.[8] The merger agreement was made an exhibit and incorporated by reference into the shareholders agreement. Section 9(a) of the shareholders agreement provides:

> [Caretenders] shall use its best efforts to register on Form S-3 (the Registration Statement") the share (the "Shares") of [Caretenders] Common Stock being issued in the Merger under the Securities Act of 1933, as amended (the "Securities Act"), for sale to the public as expeditiously as possible after March 31, 1991, in such a manner as to permit the sale or other disposition of the Shares.

Caretenders contends that its obligation to register the shares was qualified by the provision of the shareholders agreement limiting its duty to register the stocks using SEC Form S-3. The trial court held that Caretenders was obligated to use its best efforts to register the stock as "expeditiously" as possible and those efforts were not limited to the use of Form S-3. The trial court summarized its findings in the Memorandum Order, which reads in pertinent part as follows:

---

[8] The parties to the agreement included Senior Service Corporation, Senior Kentucky, Inc., and National Health Industries, Inc. as the merged companies and Franklin, Aetna Life and Casualty Company, and The Standard Fire Insurance Company signing as noteholders and/or shareholders.

It is clear to the Court that the intention of the parties all along was to register Franklin Capital's shares as expeditiously as possible, and as the merger evolved, the parties believed that the most expeditious route to accomplish the registration was on form S-3. However, there is no evidence to indicate either party intended [Caretenders'] only duty was to use its best efforts to accomplish registration of the shares on form S-3. The Court finds the intention of the parties was for [Caretenders] to use its best efforts to register the shares as expeditiously as possible, first by the use of an S-3 form, but if an S-3 was not available to the parties, then to use whatever vehicle for registration was reasonable under the circumstances, which in this case turned out to be form S-1.

Considering the record before us, particularly the merger agreement and the shareholders agreement, we concur with the trial court's conclusion that Caretenders was obligated to use its best efforts to register the shares expeditiously by whatever vehicle for registration was reasonable under the circumstances and those efforts were not limited to utilizing SEC Form S-3. Expeditious, however, is not how we would characterize the course of events from the date of Caretenders' first attempt to seek a waiver in February of 1991 to the long awaited registration in May of 1993.

Caretenders' failure to timely file Form 10-K in June of 1991 and again in June of 1992 resulted in significant delays. Moreover, Caretenders' failure to timely file its annual report, Form 10-K, precluded the use of the more expeditious SEC Form S-3 until Caretenders fully complied with its financial reporting requirements. Additionally, and although it represented to Franklin that it was prepared to do so in January of 1991, Caretenders failed to file its Form S-1 registration for another six months, after having assured Franklin the registration was prepared and ready to file.

Caretenders attributes the delays to its decision to focus on solving internal financial difficulties rather than pursuing registration. Although Caretenders may have focused its efforts on trying to solve its "financial problems," those problems remained unsolved when Caretenders succeeded in registering the shares at issue. Accordingly, the "financial problems" did not prevent Caretenders from registering the shares, they merely precluded the use of the simpler, more expedient Form S-3. As the trial court found, considering these delays:

[A] prudent management team would have filed the form 10-K on time as required by the Federal Securities laws; that it not [sic] would have made a decision to delay the filing of the S-1 registration statement in the fall of 1991; and that there was no justifiable reason why it was not filed until some five months later since a prudent management team would have dealt with the registration and the restructuring of the debt at the same time. For these reasons, the Court finds [Caretenders] to have breached the contract in not using its best efforts to register the shares as expeditiously as possible.

The shareholders agreement, the merger agreement and the minutes of the board of directors make it abundantly clear that Caretenders assumed the duty to register the shares in the most expeditious manner. Caretenders failed to do so and, thus, breached its agreement with Franklin.

BLOCK DISCOUNT

The trial court correctly determined the market for 890,000 shares of Caretenders, the number of shares Franklin owned, was limited. It also correctly determined in order for Franklin to sell the large block of shares, as it desired to do, Franklin would have to offer a discount. This practice is referred to as a "block discount."[9] The trial court applied a 25% block discount to calculate the fair market value of Franklin's shares. The parties do not dispute the propriety of the 25% block discount. Caretenders, however, contends the trial court made a mathematical error in its application of the block discount, which resulted in a miscalculation of Franklin's damages.

Caretenders' expert witness testified that the block discount measures the effect on the share price of the stock which occurs when a large block of "thinly-traded" stock[10] is to be sold. In the absence of a ready market for such a large block of stock, the expert explained, the seller must accept a lower per share price.

Based on trading information for Caretenders stock, the expert witness called by Caretenders concluded a 25% block discount would apply in this situation. He explained the block discount should be calculated by adjusting the share price to all shares subject to the discount. In response to an examination by counsel, the expert explained:

> Q. All right. So I believe that you said we were – you were using a price of $2.88 a share?
> A. Yes, that's right.
> Q. What did you do then?
> A. Adjusting that for a discount for blockage –
> Q. Uh-huh?
> A. – in order to get what the, essentially, a freely tradable value would
be, okay, and we reduce that $2.88 by 25 percent.

---

[9] The method of utilizing a "block discount" to value stocks developed in recognition of the fact that large blocks of stock can not be sold as readily as smaller blocks of stock. G.H. Fisher, Annotation, *Application of "Blockage Rule" or "Blockage Discount Theory" in Determining Stock Valuation, for Purposes of Taxation of Intangibles*, 33 A.L.R.2d 607 (2004). Block discounts are primarily used in cases involving estate or inheritance tax. *Id.* Tennessee courts recognize the block discount as a factor that may be considered when valuing shares of stock in a corporation. *Hamilton National Bank of Knoxville v. Benson,* 444 S.W.2d 277 (Tenn. 1969); *see also,* Tenn. Code Ann. § 67-8-412 (2003).

[10] "Thinly traded" stock is stock that is traded infrequently and/or in low volumes. Trial testimony provided that an average weekly trading volume for Caretenders stock was approximately 100,000 shares a week, indicating a market unprepared to absorb over 890,000 shares in a short time.

> Q.     And that's the block discount that's identified in the records; is that correct?
>
> A.     Yes.

The trial court, however, did not apply the block discount to the total value of all shares owned by Franklin. Instead, it limited the discount to the share owned by Franklin at the time of the hearing. By doing so, the trial court failed to apply the block discount to the shares Franklin sold pursuant to Rule 144. Limiting the block discount to the remaining shares erroneously increased Franklin's damages.

The trial court correctly set the price per share at $2.94, which was the value of the shares on January 31, 1992.[11] Discounting the shares by 25% produces a price per share of $2.205. Based on the only expert testimony in the record concerning the proper application of the block discount, the discount should be applied to the total shares owned by Franklin at the time of the conversion, which was 890,349 shares. The product of 890,349 multiplied by the discounted price per share of $2.205 is $1,963,219.50. Thus, the discounted fair market value of the shares owned by Franklin at the time of the conversion was $1,963,219.50. That is the amount of damages Franklin would be entitled to recover from Caretenders had it not sold some of its shares. Franklin, however, mitigated its damages by selling some of its shares. Franklin received $1,304,333 for the sale of those shares and, thus, Caretenders is entitled to a credit of that amount. We can therefore determine Franklin's damages by deducting the mitigated damages from the discounted value of all shares owned by Franklin on January 31, 1992. Therefore, the net damages sustained by Franklin for which Caretenders is liable is $658,886.50.

Finding Franklin's damages were incorrectly calculated, we therefore modify the damages awarded to Franklin to $658,886.50.

PREJUDGMENT INTEREST

Franklin contends the trial court erred in failing to award prejudgment interest. Whether to award prejudgment interest is within the sound discretion of the trial court and that decision will not be disturbed by an appellate court unless the record reveals a "manifest and palpable abuse of discretion." *Spencer v. A-1 Crane Service, Inc.*, 880 S.W.2d 938, 944 (Tenn. 1994); *Otis v. Cambridge Mut. Fire Ins. Co.*, 850 S.W.2d 439, 446 (Tenn. 1992). This standard of review clearly grants considerable deference to the trial court in the decision whether or not to assess prejudgment interest. Under this standard of review, a trial court exceeds its discretion only when it "applies an incorrect legal standard, or reaches a decision which is against logic or reasoning or that causes an injustice to the party complaining" and this court should not substitute its judgment for that of the trial court in such matters. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001). When we review a trial court's decision under this standard, the trial court's ruling "will be upheld so long as reasonable minds can disagree as to the propriety of the decision made." *Id.*

---

[11] This price is not disputed.

-11-

Tennessee's courts have always had the common law power to award prejudgment interest. *Harrison v. Laursen*, 128 S.W.3d 204, 209 (Tenn. Ct. App. 2003). The legislature subsequently codified that power. *Id.* (citing *Scholz v. S.B. Int'l, Inc.*, 40 S.W.3d 78, 81 (Tenn. Ct. App. 2000). The statute now provides, in part:

> Prejudgment interest, i.e., interest as an element of, or in the nature of, damages, as permitted by the statutory and common laws of the state as of April 1, 1979, may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum. . . .

Tenn. Code Ann. § 47-14-123 (2001). Trial courts are guided by certain principles in exercising their discretion to award pre-judgment interest. Initially, they are guided by principles of equity. *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998) (citing Tenn. Code Ann. § 47-14-123). The court must decide whether the award of prejudgment interest is fair, given the particular circumstances of the case. *Id.*; *See also Mitchell v. Mitchell*, 876 S.W.2d 830, 832 (Tenn. 1994). The court should also consider two additional principles:

> In addition to the principles of equity, two other criteria have emerged from Tennessee common law. The first criterion provides that prejudgment interest is allowed when the amount of the obligation is certain, or can be ascertained by a proper accounting, and the amount is not disputed on reasonable grounds. *Mitchell*, 876 S.W.2d at 832. The second provides that interest is allowed when the existence of the obligation itself is not disputed on reasonable grounds. *Id.* (citing *Textile Workers Union v. Brookside Mills, Inc.*, 326 S.W.2d 671, 675 (Tenn. 1959)).

*Myint*, 970 S.W.2d at 927. Considering the facts of this case, we find both the obligation of Caretenders and the amount determined to be owing to Franklin were reasonably in dispute. Therefore, we affirm the trial court's decision not to award prejudgment interest.

## IN CONCLUSION

We modify the damages awarded to Franklin to $658,886.50, affirm the trial court in all other respects and remand this matter to the trial court for entry of judgment consistent with this opinion. Costs are assessed against appellant, Almost Family, Inc., f/k/a Caretenders Health Corporation.

_____
FRANK G. CLEMENT, JR., JUDGE