IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 3, 2012 Session

## TAMALA TEAGUE, as successor personal representative of the ESTATE OF LOLA LEE DUGGAN v. GARNETTE KIDD, ET. AL.

**Appeal from the Chancery Court for Polk County**
**No. 7419    Hon. Jerri Bryant, Chancellor**

---

**No. E2011-02363-COA-R3-CV-FILED-NOVEMBER 21, 2012**

---

This appeal involves a claim filed by the Administrator of Decedent's estate to recover monetary assets that were misappropriated from Decedent prior to her death. Administrator alleged that the Kidds depleted Decedent's monetary assets, thereby breaching a confidential relationship they held with her. The trial court agreed and issued a judgment against the Kidds with prejudgment interest. We affirm the judgment against Wife as modified but reverse the judgment against Husband. The case is remanded.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part, Reversed in Part; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and D. MICHAEL SWINEY, JJ., joined.

William J. Brown, Cleveland, Tennessee, for the appellants, Garnette Kidd and William Kidd.

B. Prince Miller, Jr., Cleveland, Tennessee, for the appellee, Tamala Teague, as successor personal representative of the Estate of Lola Lee Duggan.

### OPINION

### I. BACKGROUND

In June 2001, Garnette Kidd ("Wife"), along with William Kidd ("Husband"), moved in with Wife's mother, Lola Lee Duggan ("Decedent") to care for Decedent. Wife had access to Decedent's banking and savings accounts, and Husband prepared Decedent's tax

returns. Wife became Decedent's attorney-in-fact pursuant to an executed Durable Power of Attorney, dated July 31, 2001. On May 26, 2006, Wife and Husband (collectively "the Kidds") placed Decedent in a nursing facility, where Decedent died on September 4, 2007.

TennCare filed a claim against Decedent's estate. Wife's brother, Donald Duggan ("Administrator"), was appointed to administer Decedent's estate. While inventorying the estate, Administrator discovered financial documents that had been partially destroyed by fire. The documents evidenced the existence of monetary assets contained in Decedent's banking and saving accounts as of 2001. He estimated that the documents evidenced investments, cash accounts, and bank accounts exceeding $150,000 with additional interest income. He learned that Wife listed Decedent's monetary assets as nominal when she placed Decedent in the nursing facility and that she was unable to explain how Decedent's significant monetary assets had disappeared. Given Wife's inability to account for Decedent's monetary assets, Administrator filed this suit against the Kidds, alleging that Wife, in conjunction with Husband, unlawfully and fraudulently converted Decedent's monetary assets through fraud, false dealing, and misapplication and abuse of their fiduciary relationship with Decedent. Specifically,

> [Administrator alleged] that [Wife] had undue influence and control of Decedent such that she was able to dissipate and personally acquire all of [Decedent's monetary assets]. [He claimed] that [Wife] was under the impression that, if she could keep the assets out of matters of public record for a period of five years, she would be able to place [Decedent] in a nursing home and that the funds that she had wrongfully converted would be beyond the reach of TennCare and other creditors of Decedent. [The Kidds sought not only to] defraud Decedent [and] the other heirs and to acquire the assets of Decedent, but to also defraud TennCare and other governmental entities and deny to Decedent the benefit of her assets which would have provided for her care had they not been converted unlawfully and wrongfully [].

Administrator noted that the Kidds purchased real property in February 2001 for $100,000 and in March 2004 for $13,500. He believed that the Kidds used Decedent's monetary assets to make these purchases and contended that if the Kidds had not wrongfully converted Decedent's monetary assets, TennCare would not have filed the claim against the estate.

The Kidds denied the allegations but admitted that Wife had been appointed as Decedent's attorney-in-fact and was in a "fiduciary and trust relationship with [Decedent] and [] had control of and access to [Decedent's] financial assets." The Kidds denied the allegation that they purchased the 2001 and 2004 properties using Decedent's monetary assets.

On August 28, 2010, Administrator died. Tamala Teague ("Successor") was appointed to administer the estate in Administrator's stead as a successor personal representative. Shortly thereafter, the Kidds acknowledged that they had received funds from Decedent as alleged in the complaint. The trial court issued a temporary restraining order, prohibiting the Kidds from

> disposing of any property; real or personal and from hiding, secreting or otherwise removing any property or destroying, changing, modifying, hiding or in any way tampering with any documentary evidence in this case, including bank deposits, Certificates of Deposit, Money Market accounts, savings accounts, credit union accounts, and any and all other financial documents not expressly stated [].

A bench trial was held at which the Kidds denied receipt of funds from Decedent in excess of $101,000. Wife insisted that Decedent wanted her to have $101,000 and was with her when she obtained the money from the bank using her power of attorney. She used the money to purchase a truck, pay medical bills, and buy food. She acknowledged that she and Husband purchased a 132-acre tract of land for $100,000 but insisted that they paid for the property with their own money even though she had not been employed since 1995. She noted that the deed for the property predated her appointment as Decedent's attorney-in-fact.

Wife admitted that the family accountant, E. Rene Bidez, prepared a federal gift tax return for Decedent. The return provided that Decedent gave $117,679 to Ms. Kidd on June 30, 2002. She testified that the amount listed on the return should have been $101,000, not $117,679. She denied receiving any documents concerning the return and denied writing a letter in response to an inquiry about the return. A typed, unsigned letter, addressed to the Tennessee Department of Revenue and dated April 27, 2006, was introduced into evidence without objection. The letter provided,

> It does not appear a Federal Gift Tax Return was due, even though it was filed, nor a Tennessee Gift Tax Return. During 2002, [Decedent], my mother, was 80 years old and had been diagnosed with [Alzheimer's disease]. In order to help protect her life savings, her money was placed in an account for [Wife] to help protect her from being taken advantage of due to her mental status. In addition, I moved in with her to help take care of her. The money, as well as the interest earned on the account, has been used to help in her support. Perhaps in an informal way we were attempting to establish a guardianship for my mother. She is currently 83 and what funds will still be available when she passes away will depend on her medical needs.

Wife insisted that she did not write the letter and denied any knowledge concerning who might have written the letter. When told that Mr. Bidez wrote the letter, she stated, "I can't help it. He also made a mistake on the $117,000. Think about that too."

Wife claimed that she moved in with Decedent in 2001 because Decedent, who had been diagnosed with Alzheimer's disease,[1] was "scared at night" and "would hear music playing in the night." She stated that Decedent had been unable to drive herself since 1990. She related that Decedent never discussed finances with her even though Decedent named her as Decedent's attorney-in-fact. She said that she did not know the document naming her as Decedent's attorney-in-fact existed until Decedent instructed her to retrieve the $101,000 gift. She admitted that since 1990, she had written checks for Decedent. She also admitted that she took Decedent to the bank regularly but denied having access to her bank accounts. She acknowledged that Decedent's bank statements were forwarded to her approximately six months before Decedent moved into the nursing home. She insisted that she did not have any knowledge about Decedent's finances prior to 2004 or 2005.

Counsel attempted to confront Wife with deposition testimony[2] throughout the hearing. Wife claimed that she "was so scared to death [that she] didn't know what [she] was doing" during the deposition. When confronted with her testimony in which she acknowledged that she had control of Decedent's bank accounts, she stated, "I don't know where that c[a]me from. Like I [said], I take medication and I can say anything at times." She also recanted her earlier admission that she was the *only* person who had access to Decedent's checking and saving accounts. She admitted that she knew Decedent had accounts in at least two banks but denied any knowledge about the current location of the money that had been in the accounts. When asked about burned documents evidencing several certificates of deposit in Decedent's name, she said that she did not know how the documents were burned or how the funds had been spent or relocated. She denied any knowledge of a certificate of deposit issued in March 2001 even though the document evidencing the deposit was addressed to her and Decedent. When confronted with her deposition testimony in which she said that she purchased the 132-acre tract of land with Decedent's money, she stated, "I told you I have medication that affects my mind."

Wife acknowledged that Decedent's adjustable gross income was $9,869 in 2000, $12,225 in 2001, and $2,720 in 2002. She also agreed that there was not any indication that Decedent had any income following 2002. She insisted that Decedent's only monthly income when Decedent was placed in the nursing home was $1,882.50, reflecting $1,254 from

---

[1]She could not recall when Decedent had been diagnosed with Alzheimer's disease.

[2]The depositions were not introduced into the record.

Veteran's Administration and $628.50 from Social Security. She recalled that she "went to the credit union to collect what [Decedent] had in there" and found approximately $511. She related that she attempted to use the money to pay for Decedent's burial but was told that she had to give the money to the nursing home.

Without objection, Counsel introduced a compilation exhibit evidencing the amount and type of monetary assets that were missing. Wife insisted that other than the $101,000 that she received and $21,000 that she believed Decedent gave to Administrator, she did not know what happened to Decedent's monetary assets and interest income, totaling $176,367.31. She acknowledged that she opened an account in Cleveland, Tennessee with a deposit of $48,168 but asserted that the money did not belong to Decedent. She denied moving Decedent's monetary assets in order to avoid paying for Decedent's care. She also denied any knowledge concerning $30,000 worth of logging that occurred on Decedent's property. When asked about TennCare's ability to consider Decedent's monetary assets that existed prior to her admission in the facility, Wife stated, "Well, I happen to know there's [a three-year reach-back period]. [Decedent] hit on the last day of the third year."

Husband testified that other than Social Security disability income and income from an annuity with a cash surrender value of $182,596.20, he and Wife did not have any other sources of income when they moved in with Decedent. He stated that he purchased the 132-acre tract of property with his annuity. He was aware of Decedent's substantial amount of interest income because he prepared her tax returns. Other than Decedent's gift to Wife, he did not know what happened to Decedent's money. He admitted that he destroyed several years of "tax and income documents" and evidence of his annuity. He also admitted that Wife was the only person who had access to Decedent's bank accounts.

Following the presentation of the above testimony, the trial court stated,

There is more than one way to be in a fiduciary relationship which means relationship of trust. You can be that by taking care of someone, as they were with [Decedent] even before [Wife] got the power of attorney. And then while they have the power of attorney they owe her even more of a duty of care and fair dealing and certainly that hasn't been shown here. It's [Wife's] burden to prove that [Decedent] got separate and independent advice and knew what she was doing at the time and she's put on no proof of that.

[$176,367.31] is missing. The answer that I keep getting on this stand is, I don't know[ and why] don't you understand my English, which is a belligerent response. It is a [disrespectful] response when [Counsel] has only asked his questions in a very respectful manner. He has a job to do and he is doing his

-5-

job in trying to find what money should have been in that estate and that was dissipated.

At one point there was a statement that it was done to help her get into the nursing home and exactly one day before the three years were up, or right at the three-year day, that money was gone and [Decedent] was then subsequently put into a nursing home. She had a hundred and something thousand dollars. It might have been better spent on her not being in a nursing home and taken care of her. But I believe that you-all used that money for your own benefit and not the benefit of [Decedent] and I'm giving a judgment for that.

I'm specifically finding [Wife] not believable. She was defensive. Her stories changed several times. She claims not to remember things. She claimed to be on medication and then she answered every question her lawyer asked with great clarity. That was another suspect and another red flag.

I don't find that there was any proof that th[e] annuity was cashed in. I see that there was an annuity there but I don't know where the money came from to create the annuity and I show no proof that it was cashed in. And just because there might have been possibly an ability you have to prove that that really was as an affirmative and so I'm giving a full judgment plus prejudgment interest.

Shortly thereafter, the court issued a judgment against the Kidds in the amount of $176,367.31. The court also assessed prejudgment interest on that amount at a rate of 10 percent from February 21, 2006 through April 19, 2011, resulting in an additional obligation of $90,938.24.

The Kidds filed a motion to alter or amend the judgment. Relative to Husband, they alleged that the evidence did not establish that he had a fiduciary relationship with Decedent. Relative to Wife, they alleged that the evidence did not establish that she had access to the funds, which may have not even been missing. They decried the use of the document summarizing the missing monetary assets and asserted that the court improperly excluded testimony regarding Wife's conversations with Decedent. The court denied the motion, finding that the Kidds were not credible and noting that all of the exhibits were admitted without objection. The court altered its judgment to reflect that Husband was "an interested party in the property that was purchased by the funds" taken from Decedent and rejected his testimony that they did not use Decedent's money to purchase property placed in both parties' names. This timely appeal followed.

## II. ISSUES

We consolidate and restate the issues raised on appeal by the Kidds as follows:

A.  Whether the court properly admitted into evidence a letter addressed to the Tennessee Department of Revenue.

B.  Whether the court erred in finding that Wife used her confidential relationship with Decedent to exercise dominion and control over Decedent's monetary assets for her personal use.

C.  Whether the court erred in finding that Husband used his confidential relationship with Decedent to exercise dominion and control over Decedent's monetary assets for his personal use.

D.  Whether the court erred in calculating the amount of prejudgment interest.


## III.  STANDARD OF REVIEW

On appeal, the factual findings of the trial court are accorded a presumption of correctness and will not be overturned unless the evidence preponderates against them. *See* Tenn. R. App. P. 13(d). The trial court's conclusions of law are subject to a de novo review with no presumption of correctness. *Blackburn v. Blackburn*, 270 S.W.3d 42, 47 (Tenn. 2008); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). Mixed questions of law and fact are reviewed de novo with no presumption of correctness; however, appellate courts have "great latitude to determine whether findings as to mixed questions of fact and law made by the trial court are sustained by probative evidence on appeal." *Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995).

The trial court's award of damages and award of prejudgment interest is reviewed under an abuse of discretion standard. *BankcorpSouth Bank, Inc. v. Hatchel*, 223 S.W.3d 223, 230 (Tenn. Ct. App. 2006); *Franklin Capital Assocs., L.P. v. Almost Family, Inc.*, 194 S.W.3d 392, 405 (Tenn. Ct. App. 2005). "A trial court abuses its discretion only when it 'applie[s] an incorrect legal standard or reache[s] a decision which is against logic or reasoning that cause[s] an injustice to the party complaining.'" *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (quoting *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999)). If a discretionary decision is within a range of acceptable alternatives, we will not substitute our judgment for that of the trial court simply because we may have chosen a different alternative. *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999).

## IV.  DISCUSSION

### A.

The Kidds contend that the trial court erred in admitting into evidence and considering the substance of the letter addressed to the Tennessee Department of Revenue.  They assert that the letter was inadmissible hearsay because it did not fall within one of the recognized exceptions to the hearsay rule.  They allege that the admission by a party opponent exception to the hearsay rule did not apply because there was no indication of who authored the letter.  They note that the letter was unsigned and that there was "nothing in the record to establish that the letter was ever even transmitted."  They admit that the letter was admitted into evidence without objection.  Successor does not offer any arguments on this issue.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Tenn. R. Evid. 801(c).  Hearsay is inadmissible in trial court proceedings unless it falls within one of the recognized exceptions to the hearsay rule.  Tenn. R. Evid. 802; *Mitchell v. Archibald*, 971 S.W.2d 25, 28 (Tenn. Ct. App. 1998).  Failure to contemporaneously object to the admission of inadmissible hearsay testimony results in waiver of the issue on appeal.  Tenn. R. App. P. 36(a).  While Wife denied any knowledge regarding the author of the letter, she did not object to the admission of the letter into evidence at trial.  This issue is waived.

### B.

Wife admits that she obtained a power of attorney over Decedent on July 31, 2001.  She admits that she used the power of attorney to obtain a monetary gift from Decedent but denies that she retained more than the one-time monetary gift of $101,000 from Decedent.  She notes that Successor did not introduce any evidence regarding the current value of Decedent's monetary assets but merely introduced evidence establishing the value of Decedent's monetary assets before she moved in with Decedent. Successor responds that the doctrine of spoliation of evidence allowed the trial court to draw a negative inference against Wife regarding the missing monetary assets.

"The execution and exercise of a power of attorney establishes a fiduciary relationship between the attorney-in-fact and the grantor of the power." *Ralston v. Hobbs*, 306 S.W.3d 213, 221 (Tenn. Ct. App. 2009) (citations omitted).  "The fiduciary is obligated to deal with the property of his [or her] principal in the utmost good faith." *Id.* (citations omitted).  "The duties of loyalty and honesty are also a part of a fiduciary's obligation." *Id.* (citations omitted).  In Tennessee, a presumption of undue influence arises when the dominant party in a fiduciary relationship receives a benefit from the other party. *Matlock*, 902 S.W.2d at

386 (citations omitted).  This presumption "may be rebutted only by clear and convincing evidence of the fairness of the transaction."  *Id.*

Relative to the one-time monetary gift from Decedent, Wife did not offer any admissible evidence regarding the fairness of the transaction.  While Wife asserted that she only received $101,000, the trial court specifically found Wife's testimony was not credible.  Accordingly, we conclude that the trial court did not err in imposing a judgment against her in the amount of $117,679, the amount reflected in the federal gift tax return.

Relative to the remainder of the judgment, the evidence introduced at trial established that Decedent had significant monetary assets in early 2001, that these monetary assets were depleted in some manner, and that Wife had access to these assets during the period in question.  As Decedent's fiduciary, Wife was tasked with safeguarding these assets for Decedent's benefit.  In order to recover the loss of monetary assets from Wife, Successor must prove that Wife used her position to acquire the assets from Decedent in an unfair manner. Successor presented evidence establishing that Wife purchased property for $13,500 in 2004 and that Wife opened a checking account with an initial deposit of $48,168 in 2006.  While the doctrine of spoilation of evidence *may*[3] have allowed the trial court to draw a negative inference against Wife, the fact remains that Successor failed to prove that Wife converted the remaining monetary assets for her personal use.  Successor failed to present any evidence establishing when or in what manner the assets were depleted or even that a second transaction occurred between Wife and Decedent.  Considering Successor's failure to prove that a second transaction occurred, we conclude that the trial court erred in imposing a judgment against Wife in excess of the gift evidenced in the federal gift tax return.  Upon remand, the judgment entered against Wife should be modified in accordance with this opinion.

C.

Husband asserts that the trial court erred in imposing a judgment against him because he did not possess a confidential relationship with Decedent.  Successor responds that Husband was "actively involved in the conversion" of Decedent's assets, that he "profited by the taking of her assets and funds," and that he destroyed evidence of the conversion.

A confidential relationship is a relationship where confidence is placed by one in the other and the recipient of that confidence is the dominant personality, with the ability, because of that confidence, to influence and exercise dominion over the weaker or dominated party.  *Bills v. Lindsay*, 909 S.W.2d 434, 440 (Tenn. Ct. App. 1993).  In general terms, it is

---

[3]There was no indication that the court considered this doctrine in entering the judgment against the Kidds.

any relationship that gives one person the ability to exercise dominion and control over another. *Kelley v. Johns*, 96 S.W.3d 189, 197 (Tenn. Ct. App. 2002). "The burden of proof regarding a confidential relationship rests upon the party claiming the existence of such a relationship." *Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn. 2002). "Confidential relationships can assume a variety of forms, and thus the courts have been hesitant to define precisely what a confidential relationship is." *Kelley*, 96 S.W.3d at 197 (citing *Robinson v. Robinson*, 517 S.W.2d 202, 206 (Tenn. Ct. App. 1974)).

Confidential relationships generally arise in two situations: (1) "legal relationships" and (2) "family and other relationships." *In re Estate of Brevard*, 213 S.W.3d 298, 302-03 (Tenn. Ct. App. 2006) (quoting *Matlock v. Simpson*, 902 S.W.2d 384, 385-86 (Tenn. 1995)). In the "legal relationships" context, a confidential relationship arises when there is some legal connection between the dominant party and the weaker party, such as when a dominant party is granted a power of attorney. *Childress*, 74 S.W.3d at 328. Indeed, "a confidential relationship arises *as a matter of law* when an unrestricted power of attorney is granted to the dominant party." *Id.* (emphasis added). In contrast, "[f]amily and other relationships" do not necessarily give rise to a confidential relationship per se; therefore, to establish a confidential relationship in this situation, contestants must prove the elements of "domination and control" in order to establish that the free will of the weaker party was destroyed and that the will of the dominant party was substituted. *Matlock*, 902 S.W.2d at 385-86.

The evidence introduced at trial established that Wife possessed a confidential relationship with Decedent. Indeed, Wife was appointed as Decedent's attorney-in-fact, Wife had access to and monitored Decedent's monetary assets, Wife drove Decedent to and from the bank, and Wife wrote Decedent's checks for her. The only evidence offered to establish the relationship between Husband and Decedent consisted of the fact that Husband lived with Decedent and prepared her tax returns. The fact that Husband was aware of Decedent's substantial monetary assets does not establish that he exercised dominion and control of Decedent. While Husband may have derived benefits from Wife's confidential relationship with Decedent and destroyed evidence of Wife's conversion of the assets, the evidence simply did not establish that Husband possessed a confidential relationship that would have allowed him to exercise dominion and control over Decedent. Accordingly, we conclude that the trial court erred in entering a judgment against Husband.

D.

The Kidds do not appeal the award of prejudgment interest itself or the number of days used to calculate the amount of interest. Instead, they assert that the court erred in awarding prejudgment interest at the statutory rate of 10 percent. They contend that the court should have calculated the award using the rate of interest Decedent would have received if

the funds had remained in the bank. Successor responds that this issue is waived because the Kidds did not raise any objection to the award of prejudgment interest at trial or in any post-trial motion. Successor alternatively responds that the court did not abuse its discretion in calculating the award of prejudgment interest.

While the trial court announced that its award would include prejudgment interest, the court did not disclose the statutory rate that it intended to use in calculating the amount of prejudgment interest. Indeed, the statutory rate was not disclosed until the final judgment was entered. Despite Successor's argument to the contrary, the Kidds were not required to file a motion for new trial because the case was not tried by a jury. *McCormic v. Smith*, 659 S.W.2d 804, 806 (Tenn. 1983) ("When the rules governing appellate procedure were revised, the motion for a new trial was retained as an important step of post-trial and appellate procedure in jury cases."). Additionally, the Kidds were not required to include each issue they sought to appeal in a motion to alter or amend the judgment because such motions are not a "prerequisite to appellate review" of the issues raised on appeal. *Id.* at 806 ("[A] party may request a trial judge in a non-jury matter to reconsider actions which the judge has taken, but this is not, nor should it be, a prerequisite to appellate review of those actions."). Accordingly, we conclude that this issue is not waived and is properly before this court. Having reversed the judgment against Husband and reduced the judgment against Wife, we will only consider the award of prejudgment interest as it relates to the remainder of the judgment against Wife.

The trial court may award prejudgment interest "as an element of, or in the nature of, damages . . . in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum." Tenn. Code Ann. § 47-14-123. "The usual means of compensating for [loss of use of funds] is the allowance of interest. Interest recovered in order to make the obligee whole is the relief usually sought, and the allowance of prejudgment interest under such circumstances is 'familiar and almost commonplace.'" *Mitchell v. Mitchell*, 876 S.W.2d 830, 832 (Tenn. 1994) (quoting *Deas v. Deas*, 774 S.W.2d 167, 170 (Tenn. 1989)). "The purpose of [prejudgment] interest is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize a defendant for wrongdoing." *Hunter v. Ura*, 163 S.W.3d 686, 706 (Tenn. 2005) (quoting *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998)).

In determining whether to award prejudgment interest, courts should consider the principles of equity and two additional factors. *Mitchell*, 876 S.W.2d at 830. First, an award of interest is allowed when "the amount of the obligation is certain" or reasonably ascertainable "by a proper accounting" and "is not disputed on reasonable grounds." *Myint*, 970 S.W.2d at 927. Second, an award of interest is allowed when "the existence of the obligation itself is not disputed on reasonable grounds." *Id.* However, "[t]he uncertainty of

either the existence or amount of an obligation does not *mandate* a denial of prejudgment interest, and a trial court's grant of such interest is not automatically an abuse of discretion, provided the decision was otherwise equitable." *Id.* at 928.

The amount of interest at issue relates to the estate's loss of the use of the funds, not Decedent's loss. The amount of Wife's obligation to the estate was certain as evidenced by the federal gift tax return. An award of interest was also equitable because Wife's actions deprived the estate of Decedent's use of the funds to settle her debts upon death. Moreover, the court's decision to award prejudgment interest at a statutory rate of 10 percent was wholly within the court's discretion. *See* Tenn. Code Ann. § 47-14-123. Accordingly, we affirm the trial court's award of prejudgment interest at the statutory rate of 10 percent.

## V. CONCLUSION

The judgment of the trial court is affirmed as modified, as to the judgment entered against Garnette Kidd reflecting Decedent's monetary gift of $117,679 and as to the award of prejudgment interest at a statutory rate of 10 percent. The judgment of the trial court is reversed, as to the judgment entered against William Kidd. The case is remanded for proceedings consistent with this opinion. Costs of the appeal are taxed one-half to the appellant, Garnette Kidd, and one-half to the appellee, Tamala Teague, as successor personal representative of the Estate of Lola Lee Duggan.

_____
JOHN W. McCLARTY, JUDGE