IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 9, 2013 Session

## MICHAEL JEFFRIES, ET. AL. V. UNITED STATES METAL POWDERS, INC.

**Appeal from the Circuit Court for Blount County**
**No. L17147   Hon. David Reed Duggan, Judge**

---

**No. E2013-00521-COA-R3-CV-FILED-JANUARY 22, 2014**

---

This appeal arises from a dispute concerning an employment contract between United States Metal Powders, Inc. and Plaintiffs, who claimed that they were owed vacation and severance pay when the company ceased production and sold its assets. United States Metal Powders, Inc. denied that Plaintiffs were owed vacation and severance pay. Following a bench trial, the trial court awarded severance pay but denied the claim for vacation pay. United States Metal Powders, Inc. appeals. We affirm the decision of the trial court and remand for proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which D. MICHAEL SWINEY and THOMAS R. FRIERSON, II, JJ., joined.

C. Scott Taylor and W. Tyler Chastain, Knoxville, Tennessee, for the appellant, United States Metal Powders, Inc.

David T. Black and Andrew S. Trundle, Maryville, Tennessee, for the appellees, Michael Jeffries and Shirley Marie Davis.

## OPINION

## I. BACKGROUND

Michael Jeffries and Shirley Marie Davis (collectively "Plaintiffs") worked for United States Metal Powders, Inc. ("USMP"), a New York corporation with several plants in various

locations. Mr. Jeffries worked in the maintenance division in its Maryville, Tennessee plant, while Ms. Davis served as the vice president of operations for the plant. USMP ceased production in the Maryville plant in December 2009 because of a downturn in the economy. Clive Ramsey, president of USMP, informed the employees that they had been "laid off" until USMP was able to resume production.

When Mr. Ramsey realized he would be unable to secure financing to resume production in Maryville, he received an offer from American Chemet ("Chemet"), a company "in a similar business that was interested in buying the assets and restarting the Maryville operation." While in negotiations with Chemet, he informed the employees of the change by letter, dated June 11, 2010, which provided, in pertinent part,

> Due to our lack of success, we have recently pursued the sale of our copper based powder assets to an entity that would restart the copper manufacturing and provide employment for our employees currently on lay-off.
>
> The purchase negotiation transaction is being executed as an Asset Purchase Agreement (APA) and expects to close shortly. The APA permits and encourages the purchaser to offer employment to all employees on lay-off. Please expect to receive this employment offer within the next weeks.
>
> We realize that the lay-off period has been long but our priority has been to secure for each employee ongoing employment with a profitable entity. For any employee that is on lay-off that does not receive an offer of employment, the company will be providing a severance package.

The letter conflicted with the severance policy adopted by USMP in 2001 that provided, in pertinent part,

> **STATEMENT OF POLICY:** Employees will be entitled to severance payments provided they have completed at least one year of employment and are involuntarily terminated for any reason other than misconduct. Employees are not entitled to severance payments if they voluntarily resign, retire or are on personal, family or medical leave.

Plaintiffs were offered and accepted positions with Chemet. When USMP refused to provide vacation and severance pay, Plaintiffs filed suit against USMP, alleging breach of contract.[1] Following the denial of USMP's motion to dismiss, the case proceeded to a bench trial.

---

[1]The trial court consolidated Mr. Jeffries's cause of action with Ms. Davis's cause of action.

Due to illness, Mr. Ramsey was unable to appear for trial. Mr. Ramsey's video deposition testimony was played for the trial court and entered into evidence. Mr. Ramsey testified that he had been president of USMP for approximately 30 years. He stated that from 2008 to 2010, USMP sold portions of the company and was forced to terminate several employment positions. He recalled that those occupying the non-union employment positions generally received severance packages pursuant to USMP's severance policy.[2] The severance payments were calculated based upon a formula that accounted for the respective employee's years of service, age, and his or her difficulty in finding alternative employment elsewhere.

Relative to the Maryville plant, Mr. Ramsey stated that in 2008, the operations were scaled back and several employment positions were terminated in an effort to maintain profitability. The employees that held positions that were terminated received severance packages pursuant to the policy. He related that the Maryville plant ceased production toward the end of 2009 and that the employees were told that a decision would be made concerning the plant's ability to reopen in the next three to four weeks. He claimed that at that time, the employees began recouping unemployment compensation but still received ongoing employee benefits, including insurance, from USMP. He asserted that he intended to reopen the Maryville plant and that he made an effort to keep the employees, including Mr. Jeffries and Ms. Davis, informed of the company's progress. He related that from time to time, Plaintiffs returned to the plant for various reasons and were paid for their time at an hourly rate based upon their respective salaries.

Mr. Ramsey identified the June 2010 letter and claimed that while he had the authority to modify the severance policy, the letter did not modify the policy, which anticipated severance pay as a result of an involuntary termination. He stated that the letter simply offered a severance package if employment could not be secured following the sale of the company. He claimed that the purchase agreement contained a clause requesting that his employees retain their respective positions, but he admitted that he had no control concerning whether his employees actually received an offer from Chemet. He related that Michael Lutheran, who had been employed in New Jersey by USMP, was hired by Chemet to run the new business. He stated that Plaintiffs also accepted positions of employment with Chemet in substantially similar capacities as their previous positions. He recalled that the employees who did not receive offers of employment from Chemet were awarded severance packages.

Mr. Ramsey testified that Ms. Davis, as the plant manager, possessed a copy of the policy manual and that she inquired about the fairness of the June 2010 letter in light of the policy manual, specifically the section concerning severance pay. He claimed that the policy

---

[2]Mr. Ramsey had previously denied the existence of any policy pertaining to severance.

manual was not intended to be a binding, non-modifiable contract that created vested contractual rights and that the manual specifically provided that it was not to be interpreted as a promise of specific treatment. He related that the policies could be modified at any time and that in any event, neither Mr. Jeffries nor Ms. Davis qualified for severance pay pursuant to the policy or pursuant to the June 2010 letter. He asserted that Plaintiffs were never terminated because they left voluntarily to accept employment offers from Chemet. He later asserted that they were never terminated because the company was simply reinstated under different ownership. He admitted that USMP did not own any portion of Chemet. Despite his prior testimony, Mr. Ramsey then stated that the June 2010 letter was a modification of the policy providing for severance pay. He denied ever having made assurances to Mr. Jeffries or Ms. Davis concerning severance pay if the company closed.

Ms. Davis testified that she had worked for USMP for approximately 25 years and had been the vice president of operations for approximately 15 of her 25 years with USMP. She recalled how she started with USMP as a clerk typist and eventually became vice president after receiving several promotions throughout her tenure with USMP. She stated that as vice president, she was in charge of human resources and the general running of the company. She related that beginning in June 2009, the plant was working a very short schedule until it eventually ceased production in December 2009. She claimed that she and Mr. Jeffries made the plant available for potential buyers even after the plant ceased operations.

Relative to the severance plan, Ms. Davis testified that the plan had been adopted in 2001. She acknowledged that the plan was a portion of a larger policy manual but asserted that she had never been given USMP's entire policy manual. She asserted that USMP never operated under a company policy, with the exception of the severance plan. She had used the severance plan on a number of occasions to provide payments to employees whose employment positions had been terminated. She claimed that she never sought alternative employment after the plant ceased operations because Mr. Ramsey told her numerous times that she would be eligible for severance pay. She calculated that she was entitled to $35,905.50 in severance pay and $7,109.90 in vacation pay and that Mr. Jeffries was entitled to $29,290.00 in severance pay and $5,048 in vacation pay. She opined that she never resigned, retired, or requested leave from USMP and asserted that her employment with USMP was terminated as a result of the sale of USMP to Chemet. She conceded that USMP was still in operation and acknowledged that she was never specifically told that her employment had been terminated. She asserted that the plant was no longer operating and was incapable of continuing her employment.

Ms. Davis admitted receipt of the June 2010 letter in which Mr. Ramsey asserted that severance pay would be made available to those who did not receive an offer of employment from Chemet. She identified an email she had written to Mr. Ramsey in which she objected

to his letter in light of the severance policy in place. She asserted that the letter served as her notice of termination. She acknowledged that she had accepted employment from Chemet, which had changed its name to Royal Metal Powders, Inc. upon taking possession of the Maryville plant.

Mr. Jeffries testified that he worked for USMP for approximately 30 years until December 2009, when he was advised that he had been "laid off." He recalled that Mr. Ramsey advised him that he would receive severance pay and that in reliance upon Mr. Ramsey's assurances, he declined a job opportunity in January 2010. He stated that he first learned that he would not receive severance pay from the June 2010 letter. He related that he received an offer of employment from Chemet toward the "end of June." He acknowledged that his position with Chemet carried greater responsibilities than his position with USMP.

Following the presentation of the above evidence, the trial court found that Mr. Ramsey was not a credible witness because of his inconsistent testimony concerning whether he had modified the policy, whether the June 2010 letter was intended to modify the policy, and whether Plaintiffs' employment positions had been terminated by the sale. The court further found that the policy manual contained internal contradictions concerning the modification process, namely it provided that "the policies may be repealed, modified or amended at any time and with or without notice," while also providing that any revisions to the manual would "be communicated through official written notices." The court held that Plaintiffs' employment with USMP had been involuntarily terminated, that they had a vested right to receive severance pay, and that they relied upon the representations made to them that they would receive severance pay. The court awarded Plaintiffs their respective requests for severance pay but denied their request for the recoupment of accrued vacation pay. USMP filed a timely notice of appeal before the trial court addressed the issue of pre-judgment interest. The trial court ultimately denied the motion for pre-judgment interest because the notice of appeal had already been filed, thereby depriving it of jurisdiction to consider the issue. This court denied the request to remand the case for consideration of the issue, holding that the parties could address the denial of the motion on appeal.

## II.  ISSUES

We consolidate and restate the issues raised on appeal by USMP as follows:

A.  Whether the trial court erred in awarding severance pay to Plaintiffs when they accepted positions of employment with Chemet.

Plaintiffs also raised an issue for our consideration that we restate as follows:

B.  Whether Plaintiffs are entitled to pre-judgment interest.

## III.  STANDARD OF REVIEW

We review the trial court's findings of fact de novo on the record, presuming those findings to be correct unless the evidence preponderates otherwise.  Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001); *Wright v. City of Knoxville*, 898 S.W.2d 177, 181 (Tenn. 1995).  When the trial court's factual determinations are based on its assessment of witness credibility, we will not reevaluate that assessment absent clear and convincing evidence to the contrary.  *See Jones v. Garrett*, 92 S .W.3d 835, 838 (Tenn. 2002); *Sullivan v. Sullivan*, 107 S.W.3d 507, 510 (Tenn. Ct. App. 2002).  We review a trial court's conclusions of law de novo, with no presumption of correctness.  *Whaley v. Perkins*, 197 S.W.3d 665, 670 (Tenn. 2006); *Taylor v. Fezell*, 158 S.W.3d 352, 357 (Tenn. 2005).

## IV.  DISCUSSION

### A.

USMP claims that its severance policy, along with the policy manual in general, did not create vested contractual rights that entitled Plaintiffs to severance pay.  USMP alternatively argues that even if the policy created such rights, the June 2010 letter modified the policy.  Plaintiffs assert that they had a vested right to severance pay pursuant to the policy and that the June 2010 letter was not an effective modification of the policy.

In order to prevail in a breach of contract case, Plaintiffs first had to prove that an enforceable contract existed between the parties.  *See Seramur v. Life Care Ctrs. of Am. Inc.*, No. E2008-01364-COA-R3-CV, 2009 WL 890885, at \*2 (Tenn. Ct. App. Apr. 2, 2009) (citing *BankcorpSouth Bank, Inc. v. Hatchel*, 223 S.W.3d 223, 227 (Tenn. Ct. App. 2006)).  While "[a]n employment relationship is essentially contractual," the "employment agreement may be written, oral, or a combination of the two."  *Vargo v. Lincoln Brass Works, Inc.*, 115 S.W.3d 487, 491 (Tenn. Ct. App. 2003).

In some cases, employee handbooks or manuals may provide additional terms to the employment contract. *Id.* "[B]efore a particular provision in an employee handbook or manual will be construed to be contractually binding, the relevant language in the manual or handbook, viewed in light of all the documents pertaining to the contract of employment, must reflect the employer's intent to be bound by the particular provision." *Id.* (citing *Rose v. Tipton Cnty. Pub. Works Dep't*, 953 S.W.2d 690, 692 (Tenn. Ct. App. 1997); *Smith v. Morris*, 778 S.W.2d 857, 858 (Tenn. Ct. App. 1988)). "[C]ourts will decline to construe an employee [manual] to contain enforceable contractual obligations if the [manual] states that it is not intended to be a contract or that the provisions . . . are subject to unilateral change . . . without the employee's consent." *Id.* (footnotes omitted). Despite Plaintiffs' and the trial court's claim to the contrary, this appears to be more than a general guideline. *Rose*, 953 S.W.2d at 693-94 (providing that an employer may not be bound by terms in its employee handbook unless the handbook contains language asserting contractual intent). *See, e.g.*, *Guekel v. Cumberland-Swan, Inc.*, No. 01A01-9410-CV-00482, 1995 WL 386558, at *3 (Tenn. Ct. App. June 30, 1995) (upholding trial court's summary judgment of employee's claim of wrongful discharge and breach of contract when the preface to the employee handbook provided that employer "had no intention of being contractually bound by the provisions set forth in the handbook"); *Gaines v. Response Graphics, Inc.*, No. 01-A-019204CV00181, 1992 WL 319441, at *2 (Tenn. Ct. App. Nov.6, 1992) (holding that employee handbook was not a contract when the handbook provided that it was "not a contract, that it should not be relied on as such, and that the provisions in it may be revised without notice"); *Crigger v. Columbia Power & Water Sys.*, No. 01-A-01-9001-CV00036, 1990 WL 121570, at *2 (Tenn. Ct. App. Aug.24, 1990) (reversing trial court's reinstatement of employee based upon provisions in the employee handbook when the handbook "expressly stated that it did not represent a contract and could be unilaterally changed at any time by the defendant"), *perm. app. denied* (Tenn. Jan. 28, 1991).

Here, the manual provided, in pertinent part,

**[USMP] SPECIFICALLY RESERVES THE RIGHT TO REPEAL, MODIFY OR AMEND THESE POLICIES AT ANY TIME, WITH OR WITHOUT NOTICE. NONE OF THESE PROVISIONS SHALL BE DEEMED TO CREATE A VESTED CONTRACTUAL RIGHT IN ANY EMPLOYEE NOR TO LIMIT THE POWER OF [USMP] TO REPEAL OR MODIFY THESE RULES. THE POLICIES ARE NOT TO BE INTERPRETED AS PROMISES OF SPECIFIC TREATMENT.**

Likewise, the employee acknowledgment form contained within the manual provided, in pertinent part,

Since the information, policies, and benefits described herein are necessarily subject to change, I acknowledge that revisions to the manual may occur. All such changes will be communicated through official written notices, and I understand that revised information may supercede, modify, or eliminate existing policies. The President & Chief Executive Officer has the sole authority to approve revisions to the policies in this manual.

Furthermore, I acknowledge that this manual is neither a contract of employment nor a legal document. I understand that it is my responsibility to read and comply with the policies contained in this manual and revisions made to it.

Having considered the language contained in the manual, we conclude that the manual did not contain contractually enforceable terms that may be added to the employment contract. Accordingly, we need not consider whether the June 2010 letter was a modification of the severance policy. However, this conclusion does not end our inquiry.

On appeal, Plaintiffs alternatively claim that they were entitled to severance pay pursuant to the theory of promissory estoppel. They claim that Mr. Ramsey made repeated assurances that they would receive severance pay and that they relied upon his representations in maintaining their respective positions with USMP, despite being laid off from employment. USMP responds that Plaintiffs are precluded from raising this issue on appeal when they failed to raise the issue at trial.

We agree that a party may not offer a new issue for the first time on appeal. *See Lane v. Becker*, 334 S.W.3d 756, 764 (Tenn. Ct. App. 2010) (citing *Campbell Cnty. Bd. of Educ. v. Brownlee-Kesterson, Inc.*, 677 S.W.2d 457, 466-67 (Tenn. Ct. App. 1984)). A review of the record reflects that this issue was raised by Plaintiffs at trial and addressed by the trial court. *See* Tenn. R. Civ. P. 15.02 (providing that issues tried by implied consent are not affected by a failure to amend the pleadings). Indeed, both parties presented evidence concerning Mr. Ramsey's representations or lack thereof to Plaintiffs and Plaintiffs' reliance upon those representations. The court ultimately rejected Mr. Ramsey's assertion that he had not promised severance and found that "Plaintiffs did not seek other employment, in part, because they relied upon the representations made to them that they would receive substantial severance payments." However, the court stopped short of providing relief pursuant to a theory of promissory estoppel, presumably because the court held that USMP breached its contract with Plaintiffs. With these considerations in mind, we conclude that this issue is not waived.

"Promissory estoppel is explained as: 'A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.'" *Calabro v. Calabro*, 15 S.W.3d 873, 878 (Tenn. Ct. App. 1999) (quoting *Amacher v. Brown-Forman Corp.*, 826 S.W.2d 480, 482 (Tenn. Ct. App. 1992) (quoting Restatement (Second) of Contracts § 90)); *see also Barnes & Robinson Co., Inc. v. OneSource Facility Servs., Inc.*, 195 S.W.3d 637, 645 (Tenn. Ct. App. 2006) (upholding denial of promissory estoppel claim because the reliance was unreasonable in light of the circumstances of the case). "Tennessee does not liberally apply the doctrine of promissory estoppel." *Barnes*, 195 S.W.3d at 645. A plaintiff may not recover pursuant to a theory of promissory estoppel unless

> 1. the detriment suffered in reliance [was] substantial in an economic sense;
>
> 2. the substantial loss to the promisee in acting in reliance [was] foreseeable by the promisor; [and]
>
> 3. the promisee . . . acted reasonable in justifiable reliance on the promise as made.

*Calabro*, 15 S.W.3d at 879. The doctrine of promissory estoppel is also referred to as "detrimental reliance" because the plaintiff must show not only that a promise was made, but also that the plaintiff reasonably relied on the promise to his detriment. *Id.* (quoting *Engenius Entm't, Inc. v. Herenton*, 971 S.W.2d 12, 19-20 (Tenn. Ct. App. 1997)). "[T]he promise upon which the promisee relied must be unambiguous and not unenforceably vague." *Id.* (citing *Amacher*, 826 S.W.2d at 482).

In this case, Mr. Ramsey advised Plaintiffs that they would receive severance pay. Plaintiffs were aware that several other employees had received severance pay following their termination of employment for economic reasons. By the time Mr. Ramsey issued the June 2010 letter, Plaintiffs had already relied upon Mr. Ramsey's representations instead of seeking other employment for approximately six months. With these considerations in mind, we conclude that Plaintiffs reasonably relied upon Mr. Ramsey's representations to their detriment. In so concluding, we affirm the decision of the trial court and its award to Plaintiffs of their respective severance pay. *See generally In re Estate of Jones*, 183 S.W.3d 372, 378 n. 4 (Tenn. Ct. App. 2005) (acknowledging that this court may affirm a judgment on different grounds than those relied upon by the trial court when the trial court reached the correct result).

B.

Plaintiffs ask this court to determine whether they are entitled to an award of pre-judgment interest because the trial court failed to address the issue prior to the filing of the notice of appeal. They acknowledge that remand may be appropriate for the trial court to set the amount of pre-judgment interest but assert that they are entitled to pre-judgment interest because they were deprived of the use of their severance pay for a significant period of time. USMP responds that an award of pre-judgment interest would be a "significant and inequitable windfall" to Plaintiffs.

The trial court's decision to award prejudgment interest is a discretionary one. *Franklin Capital Assocs., L.P. v. Almost Family, Inc.*, 194 S.W.3d 392, 405 (Tenn. Ct. App. 2005). Having affirmed the trial court's decision that Plaintiffs are entitled to recover severance pay, we are reluctant to encroach upon the trial court's ability to consider and apply the law applicable to pre-judgment interest. Accordingly, the trial court is directed to consider the issues of entitlement and rate of interest upon remand.

## V. CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for proceedings consistent with this opinion. Costs of the appeal are taxed to the appellant, United States Metal Powders, Inc.

_____
JOHN W. McCLARTY, JUDGE

-10-